ELI I. SCHUPACK ET AL., APPELLEES AND CROSS-APPELLANTS, V. MCDONALD'S SYSTEM, INC., AN ILLINOIS CORPORATION, ET AL., APPELLANTS AND CROSS-APPELLEES, IMPLEADED WITH ROBERT A. EDWARDS, APPELLEE AND CROSS-APPELLEE.

264 N. W. 2d 827

Filed April 5, 1978. No. 41114.

Kutak Rock Cohen Campbell Garfinkle & Woodward, for appellants.

Abrahams, Kaslow & Cassman, for appellees Schupack et al.

McGrath, North, O'Malley, Kratz, Dwyer, O'Leary & Martin, for appellee Edwards.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, CLINTON, BRODKEY, and WHITE, JJ.

WHITE, C. J.

This is an action by the plaintiffs against the defendants, McDonald's Corporation and McDonald's System, Inc., its wholly owned subsidiary (hereinafter referred to as McDonald's), for a declaratory judgment to determine the respective rights and obligations of the parties to and under a certain Right of First Refusal (or Right) originally granted by McDonald's to Bernard L. Copeland and now allegedly possessed by the plaintiffs, and for specific performance and injunctive relief requiring McDonald's to accord the plaintiffs the Right of First Refusal to acquire a McDonald's unit in Bellevue, Nebraska, and any additional units which might be in

the future developed by McDonald's in the Omaha, Nebraska, or Council Bluffs, Iowa, area. After commencement of this action McDonald's granted the franchise for the Bellevue unit to Robert A. Edwards who was subsequently joined as a defendant.

The case was tried to the court which, on September 28, 1976, found that: The Right given to Copeland by McDonald's was not a personal contract and was freely transferable or assignable without McDonald's consent; the Right was transferred and conveyed to the plaintiffs in 1964 by Copeland and John Skoog when they sold all their interest in various McDonald's franchises in Omaha and Council Bluffs to the plaintiffs; McDonald's consented (although their consent was not necessary) to this transfer of the Right by their knowledge of the transfer and their conduct subsequent to the transfer; and the area encompassed by the Right includes only that area which is within the corporate limits of the cities of Omaha and Council Bluffs as those boundaries may be fixed from time to time by appropriate ordinance, and specifically that the Right does not encompass Bellevue.

Accordingly, the District Court held that under the Right McDonald's is obligated to accord the Right of First Refusal to the plaintiffs to acquire any additional units which may hereafter be developed in the geographical area within the corporate limits of the cities of Omaha and Council Bluffs as now existing or as may hereafter be extended; and enjoined McDonald's from granting or operating franchises in the Omaha and Council Bluffs area without according the plaintiffs the Right of First Refusal to acquire such units.

McDonald's appeal from that portion of the decree which finds and holds that the Right was not personal to Bernard L. Copeland and was assignable and was assigned and transferred to the plaintiffs and that McDonald's acknowledged and consented to

this transfer. Plaintiffs cross-appeal from that portion of the decree which finds and holds that the Right is limited in scope to the corporate limits of Omaha and Council Bluffs and that it does not encompass Bellevue. For the reasons stated below, we reverse the judgment of the District Court and remand the cause for further proceedings in accordance with this opinion.

This is an equity action. The following rules govern our review of the trial court's action. "In an appeal in an equity action, it is the duty of this court to try issues of fact de novo upon the record and to reach an independent conclusion thereon without reference to the findings of the District Court." Marfisi v. Spagnola, 197 Neb. 211, 248 N. W. 2d 24 (1976). "Such independent conclusions of fact must be determined by this court in accordance with the ordinary rules governing the burden of proof and the competency and materiality of the evidence." Shirk v. Schmunk, 192 Neb. 25, 218 N. W. 2d 433 (1974). See, also, § 25-1925, R. R. S. 1943.

The Right in question was granted to Bernard Copeland by McDonald's in a letter dated July 1, 1959, which reads:

"This letter, Mr. Copeland, will confirm our understanding regarding any additional McDonald's units that may be developed in the Omaha, Nebraska, or Council Bluffs, Iowa area.

"Providing you or any corporation you are involved with, is not in default on a McDonald's franchise, or a franchise Realty Corporation lease; any locations that we might develop in the Omaha, Nebraska or Council Bluffs, Iowa area will be offered to Bernard L. Copeland first." This letter was signed by Donald R. Conley, then vice president of McDonald's.

The initial question for us to decide is whether the Right was assignable as transferable without the consent of McDonald's. "Subject to certain excep-

tions in case of contracts involving relations of personal confidence or trust or being for personal services all contracts are assignable." 6A C. J. S., Assignments, § 29, p. 626. "A contract, which shows by its nature or terms that it is personal in character, that is, that reliance for its performance is placed on the integrity, credit, or responsibility of a party, or that confidence or trust is reposed in him personally for its performance, is not assignable, even in the sense of its performance being delegated to another without the consent of the other party to the contract, * * *." 6A C. J. S., Assignments, § 33, p. 635.

In Rice v. Gibbs, 40 Neb. 264, 58 N. W. 724 (1894), we stated: " 'Rights arising out of a contract cannot be transferred if they are coupled with liabilities or if they involve a relation of personal confidence such that the party whose agreement conferred those rights must have intended them to be exercised only by him in whom he actually confided.' "

Whether the Right granted to Copeland was personal to him, and thus not assignable without the consent of McDonald's, is a question to be resolved by ascertaining the intent of the parties to the transaction. "Whether rights and duties under a contract are too personal a character to permit assignment is a question of construction to be resolved from the nature of the contract and the express or presumed intention of the parties, * * *." 6A C. J. S., Assignments, § 33, p. 636. In Rossetti v. City of New Britain, 163 Conn. 283, 303 A. 2d 714 (1972), it is stated: "Whether a duty is personal such that it cannot be delegated, however, is a question of the intention of the parties to be ascertained from the contract, its nature, and attending circumstances."

McDonald's was founded in 1954 by Mr. Ray A. Kroc. Kroc licensed and later purchased the name McDonald's and all proprietary rights thereto from two brothers named McDonald, who were operating

a hamburger restaurant in San Bernadino, California. In 1955 Kroc embarked on a plan to create a nationwide standardized system of franchised fast-food restaurants. During the period 1955 to 1959, five individuals operated McDonald's. These were Kroc, who was the founder and controlling stockholder, its president and "the head man" and "boss"; June Martino, Kroc's former secretary; Harry Sonneborn; Fred L. Turner; and Donald R. Conley.

At the trial, Kroc testified about the image he sought to create with McDonald's. He stated that he wanted "to take the joint out of hamburgers." He wanted to create "An image people would have confidence in. An image of cleanliness. An image where the parents would be glad to have the children come and/or have them work there."

Kroc testified that careful selection of franchisees was to be the key to success for McDonald's and the establishment of this image. He stated, "The way to get the image across, was that the kind of people we had in there * * *." People were selected, "who had a great deal of pride, and had an aptitude for serving the public, and had dedication." Kroc testified, "we knew that if we had people that were going to grow with us, that we were going to grow together" and, "I wanted him to be fully committed — full time, get in there with both feet and have the pride, and the philosophy that we were trying to be a part of the community. In those days * * * we were catering to the family image. So we wanted to have persons in that category, that would emulate the philosophy of McDonald's and he would be Mr. McDonald to that community."

Fred L. Turner, the current president of McDonald's testified that the process by which franchises were selected evolved gradually, and that the company made some early mistakes. By 1959, the standards for selection were fairly well established.

Turner stated that by 1957 and 1958, it became apparent that McDonald's could only achieve its goal by careful selection of persons who would adhere to the company's high standards. He stated that an individual's managerial skills and abilities were a matter of prime importance in the selection process.

Prospective franchisees would be interviewed during this early period at McDonald's by Kroc, Turner, and/or Conley. At this time approximately $25,000 was needed to acquire a franchise. Turner testified that individuals who had the money were filtered out in the interview process if they were not otherwise qualified.

At first McDonald's would occasionally grant exclusive territories to a franchisee, which would give the franchisee an absolute right to any new stores opened in the territory. This practice, however, proved to be detrimental to McDonald's growth because if the holder of the exclusive territory was satisfied with a certain number of units, McDonald's growth in that area would come to a standstill. A change was made from exclusive territories to a Right of First Refusal. The Right was better suited to McDonald's desire to expand since they could still build a unit and offer it to another party, if the holder of the Right refused the new store.

Kroc testified about the circumstances under which he would grant a Right: ''Well, this was predominantly in my hands — solely in my hands. And, if I got that inflection — if I got that funny bone feeling; if I got that feeling of trust and faith and confidence, then I would give it. I would give it — everything in those days, mind you, was an individual thing. I was dealing as an individual with an individual,'' and, ''As I said before, if he — if he gave me the kind of — that kind of reaction, and I felt that kind of confidence in his ability and in his total person in — in enthusiasm and spirit and dedication,

yes, I would, to give him the assurance that we wanted to grow with him if he did his part."

During the period 1955 to 1960, 155 McDonald's units were opened. During this period, 36 Rights, including the one in question, were granted. Thirteen of these Rights were embodied in the franchise agreement, 21 in separate letter form, and 2 in internal memos.

Plaintiffs' main witness, Donald R. Conley, at the time in question the vice president of McDonald's and director of franchising, testified that selling franchises, "was like selling a car." He stated that he routinely promised Rights to prospective franchisees as a part of his sales pitch. He testified that only when a franchisee or his attorney would pressure them, would they put a Right in written form. The applicant's personal qualifications, according to Conley, were unimportant in the granting of these Rights, and that McDonald's real concern was to obtain the applicant's money because they were financially pressed in this period. He testified:

"Q. You weren't interested in his personal ability to be able to operate this restaurant successfully at all; is that right?

"A. I had some interest, but that wasn't the real factor.

"Q. What was the real factor?

"A. The real factor was did he have the money and was he willing to put it on the line at that time."

Kroc testified that in the early days, McDonald's would never allow financial conditions to press it into granting a Right. He stated that the day after the first unit opened in 1955, they began receiving calls and that there were always people waiting for licenses. McDonald's placed into evidence its 1959 federal income tax returns which showed that McDonald's had over $400,000 in cash flow. On rebuttal, plaintiff Eli Schupack, an accountant, con-

tended that the returns evidenced a decrease in working capital for 1959.

Franchise agreements contained a clause which expressly prohibited transfer without the consent of McDonald's. Kroc explained the purpose of this provision: "Well, that was so that we would know who we were dealing with. We didn't want a questionable character who had money to be able to buy that business out. We wanted to know who that person was, and we wanted to go through the same type of thing with the new owner that we had with the old one. We wanted that authority."

Kroc testified that McDonald's never sold territories because this would have allowed a purchaser to sublease or subfranchise, and McDonald's wanted to retain direct control over what was being done.

All the Rights granted by McDonald's between 1955 and 1960 were placed into evidence. None of these Rights contain any express language of nontransferability. The first Right to contain such language is one issued in 1962. Kroc testified that despite this lack of express terms, it was the intention of McDonald's that these Rights could not be transferred without their consent:

"Q. Now, would those same considerations have been your intentions when you gave out the Right of First Refusal; Did you intend that to be something that would be different as to transferability?

"A. Well, that was no different, we were dealing with that individual. That individual that we had given that Right of First Refusal, was the individual that we were still going to deal with when a new store came up and was offered to him."

*Conley testified that he knew that if the Right was contained in the franchise agreement it would be transferred with the agreement, and that the purpose of placing the Right in a separate document was to enable McDonald's to withhold consent to a trans-*

*fer of the Right while agreeing at the same time to a transfer of the franchise.*

In the fall of 1958, Bernard L. Copeland approached McDonald's about a franchise in Omaha. McDonald's had not yet entered Omaha and thus Omaha was selected as the area of preference for his franchise.

Copeland initially dealt with Kroc at McDonald's. Kroc testified concerning Copeland: "Well, he was probably one of the — one of the most prestigious men that had come in. And, I felt very complimented to have a man of that quality come in. He was the head of the furniture division of Sears, Roebuck and Company, whom I long had a great admiration for. * * * And, [he] had built up quite an equity in their profit sharing fund, and was a man of stature and substance, and he showed it and portrayed it. He was our kind of guy, you know."

Turner testified that up to this time McDonald's licensees typically were self-employed, small businessmen, and that it was untypical to have an executive from a large prominent corporation. Copeland, at the time, was considered special. Conley admitted that Copeland was wealthy, an experienced businessman, and a "very good prospect" for a license.

Kroc testified that Copeland asked for the exclusive territory of Omaha - Council Bluffs. He told him that they no longer gave out exclusive territories, but that they would grant him a Right which was "exactly the same thing as long as he was going to open new stores." Kroc stated that he made the decision and arranged that Copeland would have a Right. On November 10, 1958, Copeland and McDonald's entered into a preliminary franchise, and preliminary agreement, which required McDonald's to use its best efforts to procure an acceptable site in Omaha and to grant him a lease and franchise for that site.

While waiting for an Omaha site to be obtained, Copeland met John A. Skoog, who also had applied for a franchise, but had not yet been granted one. The two men decided to go into partnership and operate the Omaha-Council Bluffs units jointly, and agreed to form the Copeland Corporation, owned on a 50-50 basis. On June 18, 1959, McDonald's granted a franchise and sublease to the Copeland Corporation for a site located at 8022 West Dodge Road in Omaha, Nebraska. This franchise granted no Right of First Refusal.

The Right was discussed between Conley and Copeland during the negotiations which culminated in the granting of the franchise to the Copeland Corporation. Both Copeland and his attorney, Sherman Carmell, requested to have the Right put into writing. On June 25, 1959, a week after the franchise was granted, Copeland wrote Conley stating that attempts were being made to restrict the Right which had been granted to him by Kroc to the effect that McDonald's units in the Omaha area would be offered to someone else if McDonald's did not feel that his operations were satisfactory. Copeland felt this was contrary to his understanding with Kroc and wanted this cleared up. That letter, in part, stated:

"1. You left the implication with me the other day that the 'right of first refusal' agreement covering the twin-city Omaha-Council Bluffs area would contain subjective qualifications. * * *

"2. Any such qualifications proposed are simply 'ex post facto' of the agreement which I had with Ray Kroc. At the time he and I came to an agreement on this entire move of mine he assured me that at the time the franchise agreement was signed on the first unit, I would secure *coincidentally with this a 'right of first refusal' on additional units.* He will verify that there were no *qualifying* stipulations made. * * *

"3. * * * Certainly if McDonald's feels that poor

management becomes evident at any point they could withhold franchising additional units to the Copeland Corporation until the situation is cured. * * * It would, however, be counter to my original understanding if additional units were offered *to any other party* resulting from the feeling on the part of McDonald's that the first unit was not receiving optimum management.

"4. I strongly believe that McDonald's must *now* have the same kind of faith in *my* ability to insure good, aggressive management in the Copeland Corporation, as *I* have faith in McDonald's in making such a major decision. I would like to point out that I had direct responsibility for a 200 million dollar segment of Sears' business annually over a period of years and performed to their complete satisfaction. *It certainly stands to reason that the four McDonald's units which I am ultimately planning will be given good management.* In fact, this was my purpose in bringing Mr. John Skoog into the picture as he has a very successful background in business and restaurant management." (Emphasis supplied.) Skoog testified that he participated in the writing of this letter and that it had nothing to do with the question of whether the [separately created] Right was transferable or not.

A copy of Copeland's letter was forwarded to Kroc by Conley with a memo from Conley attached which read: "In keeping with our verbal discussion - let's make it a 1st refusal right to Bernard L. Copeland. This right *will not pass* to an heir, purchaser, etc. Don 6/30." (Emphasis supplied.)

This memo was initialed "OK" by Kroc. On the *following day,* July 1, 1959, the letter containing the Right, quoted earlier, was sent to Copeland addressed to him at his Park Ridge, Illinois, address.

As a result, Conley testified that he suggested to Kroc that the Right be made personal to Copeland

instead of having subjective qualifications on it, and wrote the June 30th memo to Kroc to that effect.

Skoog, now a disinterested witness, testified as to the formation of and the personal nature of Copeland's Right of First Refusal. He explained the relationship between the Right and his business association with Copeland. Skoog stated that he had also talked to Kroc when he applied for a franchise, *but that unlike Copeland,* he had *not* been promised a Right. At the time they met, Copeland told him that he had been orally promised a Right to Omaha and Council Bluffs.

Skoog testified that the Right always stood in Copeland's name during the existence of their partnership, and that it was his understanding that the Right was a promise from Kroc to Copeland. Prior to the Right being made written, he and Copeland had discussions about whether or not it should be placed in their joint names. Skoog stated that he would have liked to have had it given to them jointly, but that Copeland had the agreement with Kroc. He testified that they decided to leave the Right in Copeland's name because when they had these discussions the negotiations for the West Dodge Road site were taking place and they felt that if they were to ask McDonald's for a change, McDonald's might want something in return or might say "No."

Skoog explained that it was his understanding he had no ownership interests in the Right and it always stood in Copeland's name as something he held individually and personally, and that the Right was something separate and apart from the franchise agreements, which is undisputed. Skoog testified, "I believe that Copeland had the Right of First Refusal, and it was a personal thing."

Skoog stated that he only shared in the benefits of the Right through his partnership with Copeland. Copeland told him, " 'John, you and I are partners' and he said, 'When we get another location, which *I*

have a Right of First Refusal on, we will be partners.' " (Emphasis supplied.) Skoog explained that in substance each new restaurant was offered to Copeland and, if accepted by him, a franchise was issued to a corporation owned jointly by the two. It is undisputed that the Right was never transferred to any of the corporations formed by Copeland and Skoog but remained in Copeland's name all through these transactions.

Summarizing, the evidence is overwhelming and almost undisputed to establish the following factual conclusions:

(1) That it was the basic and undeviating policy of McDonald's to retain the rigid and absolute control over *who* received new franchises in the rapidly expanding demand for new franchises.

(2) That the Right of First Refusal was intended to be personal in nature and was separately a grant independent of the terms of the franchise contract itself.

(3) That the grant depended upon the personal confidence and trust that McDonald's placed in the grantee, and that to permit assignability or transfer by the grantee without the permission of McDonald's, would serve to destroy the basic policy of control of the quality and confidence in performance in the event any new franchises were to be granted in the locality.

(4) That by its terms, the letter granting the Right granted it only to Bernard L. Copeland, even though it expressly recognized and extended Copeland's Right to corporate involvement in his operation and management of the franchise.

(5) That the written authority of Kroc to Conley only extended to a nontransferable Right.

(6) That the intent and the purpose of the letter granting the Right to Copeland was to look to the personal performance of Mr. Copeland.

We now discuss the credibility of Conley's testi-

mony. Conley was the chief and crucial witness for the plaintiffs. First, and, most important, we note the trial judge did not adopt or rely upon the contradictory testimony of Conley in finding that the Right was not personal in nature. An examination of his decree reveals this clearly. As we interpret the decree, particularly paragraph 7, the court's theory was based upon the actions and conduct of McDonald's subsequent to the issuance of the franchise to Copeland and the grant of the Right of First Refusal.

It appears that the witness Conley was more than just a partial witness on the part of the plaintiffs. It appears that Conley was discharged in 1964, the same year the transaction of plaintiffs with Copeland took place. Conley's bias against McDonald's was admitted by him. Conley is the president of McDonald's Operators Association (MOA), an association of dissident McDonald's franchisees. The plaintiffs are members of this association. In its newsletters, MOA has advised McDonald's franchisees that they exist under "the constant threat of harassment, intimidation, encroachment, non-renewal and even termination"; that "McDonald's executives, the trustworthy ones [are] no longer with the company"; and that McDonald's "plays favorites" in determining who was entitled to a new restaurant. In an open letter to *all* franchisees, Conley has advised them that McDonald's treats its franchisees as "enemies, simpletons, black hats, or dissidents." Conley by his own admission, forced on cross-examination, testified that what he told prospects about the importance of their personal skills in acquiring a Right of First Refusal, was, in fact, false. There are many illustrations in the record to this effect, only one example, in the interest of brevity, will be given here:

"Q. At the time you told a prospective franchisee, who was going into a new area, that he would have the Right of First Refusal on additional stores, was

his particular past experience or abilities of any great importance?

"A. I tried to make him believe that; but, it was not so. * * *

"Q. Did you try to make him believe then that his skills and abilities were important to the obtaining of this Right of First Refusal and license?

"A. In most cases, yes.

"Q. Was it the truth?

"A. No."

Again, Conley testified that in the conversation with Copeland he tried to make Copeland believe that his personal performance and business experience were factors that were important as criteria for granting a Right of First Refusal. However, on direct examination Conley claimed that, in spite of what he had told Copeland, the Right of First Refusal was not granted out of consideration for Copeland's management abilities and qualifications, but that the reason for granting the Right was simply to obtain Copeland's money. He stated that Copeland's business ability, experience, and background were not of particular interest to him although, as set out above, he tried to make Copeland believe he was being considered because of these qualities.

The critical part of Conley's testimony, admitted without objection as to competency, is that, as a result of an uncorroborated conversation occurring between sometime on June 30, 1959, and on July 1, 1959, when he forwarded the Right of First Refusal to Copeland, he issued the Right without including any language that would restrict its transferability. He testified that at the time he drafted the Right, there was no intention on his part that it be personal to Copeland. Beyond Conley's admission that he would say one thing and mean another and make fraudulent representations to prospective franchisees, his testimony is confusingly contradictory. On cross-examination, Conley admitted that the in-

tent and purpose of the Right was to look to the personal performance of Copeland. Summarizing his cross-examination, Conley could not explain why, after negotiating and insisting upon the transferable Right, as Conley claims, that Copeland, an experienced businessman who was represented by counsel, would accept a Right (exhibit 5) that was totally devoid of language of transferability. Nor could Conley explain why McDonald's would issue Copeland a freely transferable Right which entitled the holder to the first offer of a new franchise, when at the same time McDonald's would not grant Copeland a franchise that was freely transferable. His exact testimony is very significant:

"Q. Why, then, would McDonald's issue a Right of First Refusal which would be freely transferable, when at the same time they wouldn't give a franchise that would not be freely transferable?

"A. I am trying to go back to our — I can't give you an answer, counselor.

"Q. It's not consistent, is it?

"A. Everything we did was catch as catch can at that time."

On cross-examination, Conley explained the alleged overnight switch in McDonald's position as to the personal nature of the Right, by claiming that it was possible the company was not in financial trouble on June 30, 1959, when he wrote the memo to Kroc stating the Right would not be transferable and then one day later on July 1, 1959, when he issued the Right, contends the company was in such a financial bind that it had to accede to Copeland's demand for a transferable Right.

Irrespective of the conclusion that the written language of the letter granting the Right needs no interpretation and that under the law it was not transferable or assignable because of its personal nature, we rely on the testimony of the other witnesses as to the 1959 transaction and reject, on the grounds of

credibility, the uncorroborated testimony of the reasons for a switch in his drawing of the letter between the time of the memorandum that he executed to Kroc on June 30, 1959, and the forwarding of the written Right on July 1, 1959.

We hold that the Right of First Refusal granted to Copeland by McDonald's was personal to Copeland, and could not be transferred or assigned without the consent of McDonald's. We also find that the Right was not shared, transferred, or assigned by Copeland to Skoog, but that at all times during their business association the Right remained with Copeland, and that Skoog merely shared in the benefits, the operation of franchises, and of the Right.

The next question for us to determine is whether Copeland's Right was transferred and assigned to the plaintiffs, and whether McDonald's has ever consented to a transfer or assignment of Copeland's Right to the plaintiffs.

From 1959 until 1964, Copeland and Skoog acquired a total of six units, one in Council Bluffs and five in Omaha. Each franchise was placed in a separate corporation owned by them in equal shares. In 1964, Copeland and Skoog decided to sell their franchises and requested the plaintiffs, who at the time were accountants in Chicago and handled the accounting work of numerous McDonald's franchises including theirs, to act as their agents and represent them in seeking a purchaser.

After about 6 months, plaintiffs assembled a small investment group of Chicago investors, with themselves included for a small percentage of the investment who were willing to pay the price asked for by Copeland and Skoog. It was plaintiffs' intent to form an investment group which would purchase the franchises and operate them as absentee owners. McDonald's refused to consent to a sale by Copeland and Skoog to this group because McDonald's did not want their franchises operated by absentee owners.

About this time the plaintiffs then became interested in acquiring a majority interest in a purchase of the franchises.

Julian Wineberg testified that on September 14, 1964, he met with Harry Sonneborn. McDonald's had rejected the initial investor group and there was an impasse in Copeland and Skoog's attempt to sell the franchises. He wanted to resolve this. At this meeting Wineberg testified that he disclosed the existence of the Right to Sonneborn, who admitted that it did exist, and explained to Sonneborn what an excellent opportunity the Omaha area was, a growing market with only six units. He stated that he tried to convince Sonneborn that he and Schupack were the ones who should be able to acquire these franchises, and he asked Sonneborn what was required of them to get the franchises.

Wineberg testified that a few days after this meeting, they received a call from Turner and Richard Boyland, who suggested to the plaintiffs that the transfer would be acceptable if they would own at least 51 percent of the stock and if one of them would leave the accounting practice, move to Omaha, and be an active operator. After discussions between themselves, the plaintiffs agreed to accept this proposal.

Wineberg testified that he and Schupack had a meeting with Turner in October of 1964. Wineberg stated that they mentioned to Turner that the Right of First Refusal would give them an opportunity to expand in the market and invited Turner to join them as an employee or as an investor. *Turner turned them down.* Wineberg testified that he and Schupack were aware they needed McDonald's consent to acquire the Right. Wineberg testified:

"Q. All right. You were aware of the fact that you needed McDonald's consent before you could acquire any of the interest in the corporations held by

Copeland and Skoog or any of Copeland's *personal* interests, were you not?

"A. Yes, we were knowledgeable that we needed McDonald's consent." (Emphasis supplied.)

Turner testified that the Right never came up at this meeting. He stated that he emphasized, "The opportunities to improve the existing operations and that there was a lot more volume in those stores," and that any discussion of the growth potential of the Omaha area was in terms of the volume of the existing stores. He admitted, however, that there probably was discussion by the plaintiffs about their ability to obtain additional stores.

Following the discussions with Sonneborn, Turner, and Boyland, the plaintiffs agreed to purchase Copeland and Skoog's interests in the Omaha-Council Bluffs franchises, for a net purchase price of $473,500, subject to McDonald's consent. Schupack testified that Copeland had discussed the Right during negotiations and that he had stated: "That he was selling all of his interests, the stock in the corporation, his Right of First Refusal and everything else that he had involved in the Omaha-Council Bluffs area." Skoog also testified that the Right was discussed during negotiations with the plaintiffs, and that the sellers did not intend to retain any interest in the Right after the sale. They did not know if it was transferable, but if it was, they intended to transfer it. They intended to sell, "the right, title, and interest in anything we had in the Omaha-Council Bluffs area - in anything we had in McDonald's," according to Skoog. Skoog stated that their attorney advised them not to allocate any part of the purchase price to the Right because in the event the Right was not transferable they would have to refund part of the purchase price to the buyers. Schupack testified that the price asked by Copeland and Skoog for the existing stores was in excess of their actual value and that the expan-

sion rights in the market area represented the premium.

On November 19, 1964, the plaintiffs sent McDonald's a letter advising them of their intention individually, as agents, and/or as agents of corporations to be formed: ''to purchase all of the issued and outstanding stock in all corporations now operating McDonald's franchises and/or sub-leases at locations above described, together with all right, title and interest of any and all individuals now operating said franchises and/or sub-leases on locations above described.''

Turner testified that he was very upset and concerned with plaintiff's attempt to purchase the franchises and that he stopped consideration by McDonald's of their original offer to purchase the franchises. He did not think that the plaintiffs would make good operators and he thought that they ''were going to pull a fast one on the company and set up an absentee investor deal and we would have some operation problems in Omaha.'' Axelrad, McDonald's general counsel, then put some pressure on Turner advising him he should make certain that McDonald's did not unreasonably withhold its consent to a transfer of the franchises. Axelrad testified that he recognized a franchisee has a right to sell his franchise and that McDonald's could not withhold its consent without reason. Out of subsequent discussions, the proposal that plaintiffs own 51 percent of the stock in the franchises, and that one of them move to Omaha to actively operate the units, emerged.

Despite the plaintiffs' acceptance of these terms, Turner remained very negative to the idea of the sale of the franchises to the plaintiffs. On advice from Axelrad that consent could no longer reasonably be withheld, Turner reluctantly agreed to a consent to the transfer of the six franchises under these conditions. Turner then turned the matter

over to Axelrad to draft the necessary written consent. Turner told Axelrad to be very careful and dot the "i's" and cross the "t's".

Axelrad testified that during his routine examination of the files he became aware of the existence of the Right. He stated that *prior to drafting the consent* he had a vast amount of conversation with Schupack over his eligibility to acquire the stores, and that the Right was discussed. *Axelrad testified he advised Schupack that the Right was considered a personal Right and would expire at the time of the transfer, that it would have to be reissued in the plaintiffs' names, that the matter of his eligibility to acquire the stores was very touch and go, that Turner had only reluctantly agreed to consent to this sale, and that to press for the Right might tilt the entire transaction backwards.* Axelrad testified this was *not* a major issue and *Schupack conceded that to let it go was the most practical route since he was most anxious to acquire the stores.* He stated that Schupack's primary concern was just getting the franchises and that he did not make an issue over the Right. In response, Schupack only testified that he *did not recall* having any conversations with Axelrad in 1964.

On November 19, 1964, McDonald's issued its consent to the transfer. The consent, in part, read: "* * * we have examined a purported Purchase and Sale Agreement under which you propose to sell all of your right, title, and interest individually, and as stockholders * * * in the following named corporations: * * *.

"The undersigned, as an inducement and reliance of the aforesaid representation and compliance with the terms and conditions of the aforesaid Purchase and Sale Agreement, does hereby consent to the transfer of all stock in the aforesaid corporations by you to said Eli L. Schupack and Julian J. Wineberg,

individually, as agents, and/or as agents for corporations to be formed.''

On November 24, 1964, plaintiffs and the sellers executed a purchase and sale agreement. Following the purchase the plaintiffs established corporations to take over each of the sellers' corporations. The total purchase price was allocated to the assets shown on the corporate books. The Right was not set up as an asset on the books of any of those corporations, and no part of the purchase price was allocated to it. There was testimony that in 1964 it was McDonald's policy to reissue a Right of First Refusal in the name of the transferee if such transfer was consented to by McDonald's. Copeland's Right was never reissued in the names of Schupack and/or Wineberg.

After their purchase of the franchises in 1964, the plaintiffs were desirous of more units. In August 1970, Edward H. Schmitt, McDonald's regional manager for the area at that time, met with Schupack to discuss the licensing of a new store on South 40th Street in Omaha. Schmitt testified that there was no mention of the Right during his discussions with Schupack. Schmitt made a verbal commitment to license this unit to Schupack. Schmitt testified that the South 40th Street unit was offered to Schupack, not because of any claim by the plaintiffs that they had a Right, but because Schupack was an existing franchisee in the area who was operating in a successful manner and had met McDonald's formal standards for expansion, in accordance with general company policy. Schupack testified that the Right was mentioned in discussions he had in Chicago with Bernard Hall, Schmitt's successor, prior to the franchise on the South 40th Street site being granted.

As part of the routine licensing procedure, Schmitt made a written request to McDonald's licensing department for a territorial clearance. In accordance with general procedure, upon receipt of such a re-

quest, the department searches the franchise files to determine whether there is any Right or exclusive territory outstanding on the site of the proposed unit. If there is a Right, it will be evidenced in the files and noted on the response to the clearance request. The review made pursuant to Schmitt's request disclosed there were no outstanding Rights in Omaha on the South 40th Street location at the time. In 1963, a clearance request for the unit at 42nd and E Streets in Omaha disclosed that this site was subject to a First Refusal Right in Bernard L. Copeland.

On September 15, 1971, McDonald's offered, in writing, the South 40th Street location to Schupack. On September 24, 1971, Schupack made a written acceptance of the offer of this unit. The franchise on this unit was granted on October 6, 1971.

On September 24, 1971, Schupack wrote Turner a letter complaining about the terms under which he had to accept the South 40th Street unit. He wrote: "Your company presumably has a right to offer franchises under any terms to new franchisees; however, in this instance, I strongly feel that your company is denying certain rights purchased by me and others in 1964 dating back to 1959. Certainly the first right of refusal becomes meaningless under your current terms."

Turner testified that he skimmed over this letter and turned it over to J. Kenneth Props who pointed out to him that the letter made a claim to the Right of First Refusal which should be answered. On November 23, 1971, Turner responded to Schupack: "There is one inference in your letter that I would like to correct, and that refers to 'first right of refusal'. *There is no such right* at the present time in Omaha, since it was granted to *Bernard Copeland individually* and was not passed on when he sold the units." (Emphasis supplied.)

In 1974, McDonald's developed a unit in Fremont, Nebraska, which was offered to someone other than

the plaintiffs. On March 28, 1974, Schupack wrote Pat Flynn, McDonald's district manager, contending that Fremont was in the Omaha-Council Bluffs area and that not offering it to him was a "violation of the agreements between your companies and mine." In his letter, Schupack cited the July 1, 1959, letter from Conley to Copeland. On April 12, 1974, Flynn wrote back advising that: "There is no existing right of first refusal for the Omaha, Nebraska and Council Bluffs, Iowa area."

In 1975, McDonald's developed a unit in Bellevue, Nebraska. This unit was originally offered to the plaintiffs, but with conditions relating to contributions to a national advertising fund which Schupack found unacceptable. Subsequent to the plaintiffs' refusal of the unit, McDonald's offered it to the defendant Edwards who accepted it. This litigation followed.

We hold that McDonald's did not consent to a transfer of the Right of First Refusal from Copeland to the plaintiffs, but that they only consented to a sale of the stock in the then existing franchises. We also find McDonald's has consistently maintained the position that the Right of First Refusal was personal only to Copeland and did not pass to the plaintiffs, and has acted in accordance with that position, and has not at any time subsequent to the 1964 purchase of the Omaha-Council Bluffs franchises by the plaintiffs, recognized the existence of the Right of First Refusal in the plaintiffs.

Accordingly, plaintiffs possess no Right of First Refusal to additional McDonald's franchises in the Omaha-Council Bluffs area. Holding as we do, it becomes unnecessary for us to discuss the plaintiffs' cross-appeal relating to the scope of the Right.

The judgment of the District Court is reversed and the cause remanded for further proceedings in accordance with this opinion.

REVERSED AND REMANDED.

WHITE, C. THOMAS, J., dissenting.

The majority omits in its discussion of de novo review a significant part of that standard. When credible evidence on material questions of fact is in conflict, we will consider that the trial court observed the witnesses and their manner of testifying and accepted one version of the facts rather than the other. See Shirk v. Schmunk, 192 Neb. 25, 218 N. W. 2d 433.

The majority concludes that it is better able to determine on a reading of the record, than was the trial judge who saw, heard, and observed the witnesses, who was truthful and who was not. I confess that the record does not speak as plainly to me as it does to the majority. I would have placed great reliance on the findings of the trial judge.