### In the Matter of OPTIMUM MERCHANTS SERVICES, Debtor.

**Bankruptcy No. BK93–82092.**

United States Bankruptcy Court, D. Nebraska.

Jan. 28, 1994.

John Brownrigg, Michael Washburn and David Buelt, Omaha, NE, for debtor.

Jerrold L. Strasheim and Mary Swick, Omaha, NE and David Domina, Norfolk, NE, for Bank.

### MEMORANDUM

TIMOTHY J. MAHONEY, Chief Judge.

Hearing was held on January 19, 1994, on the Motion to Assume Agreement with the Abbott Bank (Abbott). Appearing on behalf of debtor were John Brownrigg and Michael Washburn of Erickson & Sederstrom, Omaha, Nebraska, and David Buelt of Omaha, Nebraska, and David Crawford of Schmid, Mooney & Frederick, P.C., Omaha Nebraska. Appearing on behalf of Abbott were Jerrold Strasheim and Mary Swick of Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, Omaha, Nebraska, and David Domina of Omaha, Nebraska. This memorandum contains findings of fact and conclusions of law required by Fed.Bankr.R. 7052 and Fed.R.Civ.P. 5. This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(A).

## Issue and Decision

This dispute concerns whether the debtor-in-possession may assume the rights and duties of the debtor under an Agreement which is between the debtor and Abbott. The motion to assume the Agreement is granted.

## Background

The debtor, sometimes referred to as OMS, is a Delaware corporation authorized to do business in Nebraska. It is engaged in the activities of developing, promoting and marketing bankcard and other business programs. It entered into an Agreement (Agreement), Exhibit 1, with Abbott Bank, Alliance, Nebraska, (Abbott) on or about July 1, 1988. The Agreement, which has been amended three times by the First Addendum dated December 24, 1990, the Second Addendum dated September 20, 1992, and the Third Addendum dated January 1, 1993, specifies the rights and duties of both parties with regard to the creation of a credit card program to be marketed on behalf of Abbott. In general, it allows the debtor to develop and market a bankcard program, including Visa and Mastercard, in the name of Abbott. The debtor, acting as a consultant and as an independent contractor, put in place systems, procedures, and marketing programs whereby Abbott became a member of the Visa and Mastercard systems, and Abbott was permitted to sign up Agent banks to contract with local Merchants to accept the Abbott bankcards and obtain credit card customers for Abbott throughout Nebraska and other parts of the United States.

The program set up pursuant to the Agreement was successful to the extent that Abbott obtained a significant number of Agent banks and as of October of 1993, obtained up to $65 million in credit card loan balances.

During the life of the Agreement, the parties negotiated three different written amendments which have been identified above. The Third Addendum contains significant changes from the original Agreement. It changed the prior practice of the parties with regard to which party was responsible for risk management of the credit card oper-

ation from the debtor to Abbott. It outlined the specific duties of the debtor and provided that, upon request of Abbott, the debtor would perform certain additional duties. Paragraph 2 of the Third Addendum also limited the debtor's obligation to perform its duties to a certain group of Merchants or Agent banks identified by the parties as OMS Acceptors as defined in the Third Addendum at Paragraph 3.2(a).

The Third Addendum amended the Agreement at Paragraph 1.17 to permit Abbott to terminate any or all of its Merchant, Agent or ISO (independent sales organization) relationships.

The Third Addendum at Paragraph 1.17 contains disputed language that, under certain circumstances, requires both notice to the Merchants or Agents and to the debtor, and permits the debtor to attempt to move Merchant business from Abbott to another authorized member of Visa or Mastercard.

A major component of the Third Addendum is to change the focus of the revenue stream which is received by the debtor and Abbott from Merchant fees and earnings on consumer credit card operations. The change apparently was intended to cause the debtor to look to Merchant fees rather than consumer card operations for its share of the revenue that was to be produced in favor of the parties under the Agreement. This change has also caused some of the disputes between the parties with regard to interpretation of the Agreement.

Various paragraphs in the Third Addendum deal with circumstances under which Abbott will have a continuing obligation to assure revenue to the debtor even after termination of the Agreement or after disposal of Merchant or Agent bank business.

In the Agreement at Article V, Paragraph 5.1 and 5.2, the parties agreed that neither would enter into any competing agreements for similar services with other parties, and the debtor agreed, as additional consideration, to obtain and deliver to Abbott the personal agreement of John H. Westering, the sole shareholder and president of the debtor, to provide his services exclusively for the benefit of Abbott. The Third Addendum,

at Paragraph 14 deletes the requirement of providing personal services of Mr. Westering. The Third Addendum deletes the exclusivity requirement with the following language:

Paragraph 5.1. During the term of this Agreement, Abbott may enter into competing agreements for Merchant, Agent or ISO services provided such may not increase Abbott's costs which are deducted in computing the Merchant fee computed pursuant to Paragraph 3.2(a). Additionally, Abbott shall pay OMS a 25¢ per settled draft fee in connection with such non-OMS transactions provided by OMS. Nothing in the agreement or this Third Addendum shall act or be construed to restrict or prohibit Bank from entering into direct arrangements with Merchants, Agents or other ISOs regarding bankcard or Merchant services. Likewise, OMS may enter into competing agreements with other financial institutions. Abbott shall not transfer OMS Acceptors to other ISOs which provide Merchant services for Abbott; and OMS shall not transfer OMS Acceptors to other members of the Interchange System except as may be otherwise specifically authorized by this Agreement.

In the spring of 1993, the parties began to have difficulties concerning their rights and responsibilities under the Agreement. Among other things, Abbott decided that it no longer wanted to do business with a group of Merchants the parties have referred to as the "Dodds Merchants." Abbott gave notice to the Dodds organization in May of 1993 that it would terminate its relationship with Dodds at the end of a six-month period. The debtor received a copy of such notice. The debtor and Abbott then entered into discussions concerning the right of the debtor to attempt to transfer the Dodds Merchants block of business to another bank. Both the written evidence and the testimony of the president of Abbott make it clear that Abbott no longer intended to deal with the Dodds Merchants and that Abbott consented to the attempts by the debtor to transfer the Dodds business to another bank. However, disputes arose between the debtor and Abbott concerning the type of notice that was required to be given to the Dodds entities and

to the debtor, and disputes arose concerning the rights of the debtor under the Agreement to transfer Dodds business.

In an attempt to transfer the Dodds business, the debtor engaged in discussions with the Union Bank & Trust in Lincoln, Nebraska (Union). Union was and continues to be an Agent bank of Abbott. The debtor and a related corporation, created by Mr. Westering for the sole purpose of dealing with the Dodds Merchants and a new bank, negotiated a contractual arrangement with Union whereby Union would upgrade its membership in Mastercard and Visa from the level of an Agent to the level of a Principal. This apparently would mean that Union could solicit Merchant business for its own benefit and individual credit card business for its own benefit, rather than for the benefit of Abbott. As with most other things involved with this case, there is a dispute between Abbott, Union and the debtor over the actual effect of the contractual arrangements between the debtor and Union.

Notwithstanding the above suggested dispute, there is no dispute over the fact that the debtor provided to Union a significant amount of information about the Dodds Merchants business. That information included the number of Merchants currently on board, the monthly and annual amount of business from the Merchants in dollar figures, and the fees and costs of processing related to the Dodds Merchants.

Once the debtor disclosed to Abbott that the bank to which the debtor intended to transfer the Dodds Merchants was Union, Abbott informed the debtor that not only would it not consent to a transfer of the Dodds Merchants to Union, but that it was terminating the Dodds Merchants and the Dodds relationships immediately. In addition, Abbott notified the debtor that it deemed the Agreement between debtor and Abbott to have been breached by the debtor both in disclosing the Dodds Merchants financial information to Union and by entering into the contractual arrangements with Union.

The contractual arrangements between Union and the debtor required the debtor to

be an exclusive provider of services to Union. Such a requirement on its face appears to require the debtor to violate its contractual arrangements with Abbott. On October 11, 1993, Abbott sent a letter to debtor, Exhibit 9, alleging that the debtor, in violation of Section 14 of the Third Addendum, abused its access to confidential trade secret information and used that information to solicit a relationship with Union, an Agent bank. In addition, Abbott alleged that the debtor had breached the Agreement by neglecting and refusing to act responsibly to develop and maintain cardholder, Merchant, Agent, ISO, and other third party relationships or to attend to matters pertaining to customer service.

In addition to the letter, the debtor was informed by Abbott, on or about October 18, 1993, that Abbott was prepared to immediately terminate the Dodds Merchants relationship. On October 18, 1993, the debtor filed a petition in the District Court of Douglas County, Nebraska, naming Abbott as a defendant, praying for an order restraining Abbott from terminating any of the Dodds Merchants, and requesting the Court to specifically enforce the Agreement by affirmatively requiring Abbott to assign its agreements with the Dodds Merchants to Union. The Court entered a temporary restraining order and enjoined the termination of the existing Dodds Merchants contracts. The temporary restraining order and injunctive relief is still in effect by virtue of an agreement between the parties.

On October 26, 1993, after discovery of materials from Union, Abbott sent another letter, Exhibit 10, to counsel for the debtor alleging additional breaches of the Agreement. The last paragraph of the October 26, 1993, letter states:

OMS must do what is necessary to cure these defaults to the fullest possible extent within thirty days of this date. Of course, losses sustained by the Bank will be the responsibility of OMS to the extent those losses have been proximately caused by OMS's default, breach of contract, or by OMS's negligence or other tortious acts.

Although the parties continued to discuss the problems with the Union transaction and the Dodds Merchants, they were unable to come to any amicable solution.

By letter dated December 10, 1993, Exhibit 18, Union and the debtor agreed that the relationship represented by their contractual arrangements would terminate effective as of December 15, 1993, if the Dodds Agreements were not assigned by Abbott to Union by that date. The parties in this case do not dispute the fact that Abbott did not assign the Dodds Agreements by December 15, 1993. Therefore, the Agreement between Union and the debtor terminated as of December 15, 1993.

On December 20, 1993, Abbott sent another letter, Bank Exhibit 20, to the debtor and counsel for the debtor. The letter was hand delivered on the 20th of December, and the parties have referred to the letter as the "termination letter." In Paragraph 3, the letter states:

Now, The Abbott Bank has *no* reasonable alternative but to terminate its entire contract, and all attendant relationships with OMS. This action is taken pursuant to the provisions of Paragraph 13 of the Third Addendum as noted above. Termination is effective at 6:00 P.M. CST on Monday, December 20, 1993; this action is taken at the direction of the Bank's Board of Directors given on December 18, 1993.

Before 6:00 P.M. CST on December 20, 1993, the debtor filed a verified amended petition in the District Court of Douglas County, Nebraska, naming Abbott as the defendant and requesting an order restraining Abbott from terminating the Agreement between Abbott and the debtor. Further, the debtor requested the Court to specifically enforce the Agreement of the parties by affirmatively requiring Abbott to honor its Agreements with the debtor, not only by requiring Abbott to assign Dodds Merchants to Union, but also by requiring Abbott to continue the basic business relationship of the parties as evidenced by the Agreement. A Douglas County District Court judge did enter a temporary restraining order prior to 6:00 P.M. CST on December 20, 1993. The temporary restraining order prohibits Abbott from terminating the existing contractual re-

lationship, orders Abbott to allow the debtor to continue to perform its functions as delineated in the Agreement, and further orders Abbott to continue to compensate the debtor pursuant to the terms of the Agreement.

On December 22, 1993, on the eve of a final hearing on the temporary restraining order scheduled before a judge of the District Court of Douglas County, Nebraska, the debtor filed this Chapter 11 petition. The hearing was postponed, and the Temporary Restraining Order is still in effect. Shortly thereafter, the debtor filed this pending motion to assume an executory contract, the substance of which is the Agreement.

This Court scheduled a trial on the motion to assume the executory contract. Trial was held on January 19 and 20, 1994. The issue to be determined, as stated by the Court in a conference held with the parties on January 14, 1994, and in an order filed January 18, 1994, was whether or not the debtor could assume the executory contract. Breaches of the Agreement were to be assumed, and the parties were permitted to present whatever evidence they felt appropriate with regard to the ability of the debtor to cure breaches, the actual pecuniary loss to Abbott as a result of the alleged breaches, and the ability of the debtor to provide adequate assurance of future performance. The Court specifically declined to determine whether or not there had been an actual breach of the Agreement by the debtor, what the actual amount of the damages were as a result of such actual breach, and left those issues to be determined in the appropriate forum. Pursuant to the authority of the most recent circuit court decision that this Court was able to find on the authority of the bankruptcy court with regard to motions to assume contracts and determine breach of contract issues, *Orion Pictures Corp. v. Showtime Networks, Inc., (In re Orion Pictures Corp.)*, 4 F.3d 1095 (2d Cir.1993), this Court will evaluate the evidence presented at the trial by "placing itself in the position of the trustee or debtor-in-possession and determining whether assuming the contract would be a good business decision or a bad one." 4 F.3d at 1099.

## Bankruptcy Court's Authority to Determine Motion to Assume

The Second Circuit's opinion in *Orion Pictures Corp. v. Showtime Networks, Inc.*, 4 F.3d 1095 (2d Cir.1993), discusses the authority that a bankruptcy court possesses to determine whether a party may assume a contract and the issues surrounding the assumption. *Orion* dealt with an agreement between Orion, a producer and distributor of motion pictures, and Showtime, a subscription cable operator. The agreement provided that Showtime would license all films distributed by Orion, subject to restrictions, provided that Orion continue to employ at least two of four named Orion executives (the "key-man" clause). Showtime notified Orion that it was in violation of the "key-man" clause in letters dated October 17, 1991 and November 20, 1991. In response, Orion filed for Chapter 11 reorganization on December 11, 1991, and on December 24, 1991, Showtime notified Orion that it would no longer license films under the agreement because of the breach of the "key-man" clause.

Orion filed a Motion to Assume and an Adversary Proceeding, which sought declaratory judgments finding that Showtime was obliged to pay license fees to Orion and that Showtime was estopped from claiming that Orion violated the "key-man" clause. The bankruptcy court ruled that because Orion had not violated the "key-man" clause it could assume the contract, and as a result of this ruling, the court dismissed the Adversary Proceeding as moot. The district court affirmed. *See Orion Pictures Corp. v. Showtime Networks, Inc.*, 149 B.R. 342 (S.D.N.Y. 1992).

The Second Circuit vacated the bankruptcy court's holding and remanded the case back to the bankruptcy court. *Orion*, 4 F.3d at 1099–1100. The Second Circuit determined that a motion to assume is a summary proceeding intended to review the debtor-in-possession's decision to adhere to or reject a particular contract in the course of the swift administration of the bankruptcy estate and that it is not the place for a lengthy trial over a breach of contract dispute because 11 U.S.C. § 365 does not authorize a bankruptcy court to incorporate under-

lying contract disputes into the Motion to Assume. *Id.* at 1098–99.

■ The Second Circuit held that a bankruptcy court reviewing a "decision to assume or reject an executory contract should examine a contract and the surrounding circumstances and apply its best "business judgment" to determine if it would be beneficial or burdensome to the estate to assume it." *Id.* at 1099 (citing the court's prior holding in *In re Minges,* 602 F.2d 38, 43); *See also NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 523, 104 S.Ct. 1188, 1194, 79 L.Ed.2d 482 (1984). To permit a bankruptcy court to go further than the business judgment test and decide the underlying contractual dispute would, in the view of the Second Circuit, permit the bankruptcy court to control the end result of the exercise of its judgment, and such a result would be incompatible with the limited purpose of motions to assume, which is to preserve valuable property of the estate. *Orion,* 4 F.3d at 1099.

In an action under § 365(b)(1), *Orion* defined "business judgment" as:

a judgment of the sort a businessman would make. In no way is this decision a formal ruling on the underlying disputed issues, and thus will receive no collateral estoppel effect. In a given case, a bankruptcy court might decide that it would be beneficial for the trustee or debtor-in-possession to assume a certain contract because the court thinks it unlikely that a court would hold that the debtor had breached the contract, and thus assuming the contract would be a good "business judgment." This "business judgment" could turn out to be wrong, however, if a later fact finder in an adversary proceeding decides that the underlying contract was in fact breached. In such a case, the judge's wrong decision is simply an error of business judgment, not a legal error.

4 F.3d at 1099.

■ In addition to determining whether the Agreement is beneficial to the debtor-in-possession, other courts have considered the impact of the Agreement on the other party and the potential detriment to unsecured creditors who would be subordinated to the payment of damages resulting from any post-assumption breaches. *In re Washington Capital Aviation & Leasing,* 156 B.R. 167 (Bankr.E.D.Va.1993). Concerning the Agreement between debtor and Abbott, all alleged breaches occurred pre-petition, and the major unsecured creditors who would be affected would be John Westering and Abbott, provided that Abbott files a claim. Therefore, in exercising its business judgment, this Court should examine the impact of the Agreement on the parties to it, consider that the Agreement is the major asset of the estate, and the only opportunity that debtor has for reorganization. *Corporation de Servicios Medicos Hospitalarios v. Mora,* 805 F.2d 440, 446 (1st Cir.1986) (stating that contract termination suit threatened debtor of its principal asset, jeopardized its only opportunity for reorganization, and would force it into Chapter 7 liquidation).

*Orion* interprets the Bankruptcy Code to permit the bankruptcy court to determine the assumption of contract issue without first having the breach of contract issue adjudicated in State Court or before an Article III court. Abbott alleges that the predominate substance of the "contested proceeding" is "non-core" rather than core, and this Court may not determine any core bankruptcy matters (assumption of contract) until the State Court makes its determination of the non-core breach of contract causes of action. However, in *Orion* the Second Circuit permitted the bankruptcy court to expeditiously determine the assumption issue first. Under *Orion,* this Court has authority to quickly determine the assumption issue and make a business judgment determination of whether there was a breach and whether the breach may be cured without waiting for the parties to conclude a lengthy trial.

### Findings of Fact, Discussion, and Conclusions of Law

It is clear from the evidence that the Agreement was not terminated by virtue of the December 20, 1993, letter from Abbott to the debtor because that termination letter contained on its face a date and time of termination. The time was to be 6:00 P.M., and the date was to be December 20, 1993.

Prior to 6:00 P.M. on December 20, 1993, a state district court judge enjoined Abbott from terminating the Agreement. Therefore, as a matter of law, the Agreement was not terminated by the letter.

Abbott urges the Court to find that because of the variety of breaches and the significance of the breaches allegedly caused by the debtor, that the Agreement was materially breached to such an extent that it terminated without any requirement of notice or opportunity to cure. Since this Court is not able, either by the *Orion* decision or by its own order, to determine whether there was a breach, or the materiality of that breach, this Court declines to make such a finding. The Court instead will outline the factual basis for its determination that the Agreement is assumable and that assuming the Agreement would be a good business decision for the debtor.

The Bankruptcy Code at 11 U.S.C. § 365(a) permits a trustee to assume or reject an executory contract of the debtor. Pursuant to Section 365(b), if there has been a default in an executory contract of the debtor, such contract may not be assumed unless the trustee cures, or provides adequate assurance of a prompt cure, and unless the debtor compensates or provides adequate assurance that it will promptly compensate the other party for actual pecuniary loss resulting from such default and further provide adequate assurance of future performance under the contract.

 Abbott contends and OMS disputes that the Agreement between debtor and Abbott is a personal service contract. A personal service contract is defined as a contract involving the performance of non-delegable duties, requiring the exercise of special judgment, taste, skill or ability. *In re Fastrax, Inc.,* 129 B.R. 274, 278 (Bankr.M.D.Fla.1991). Accordingly, personal service contracts are ordinarily non-assignable by law. *In re Rooster, Inc.,* 100 B.R. 228, 232 (Bankr. E.D.Pa.1989).

Abbott cites *Schupack v. McDonald's System, Inc.,* 200 Neb. 485, 264 N.W.2d 827 (1978), in support of its contention that under Nebraska law the Agreement is non-assumable as a personal service contract. In *Schu-pack,* McDonald's Systems (McDonald's) granted the Copeland Corporation a McDonald's franchise in the Omaha/Council Bluffs area and granted Mr. Copeland a right of first refusal, which allowed the holder to acquire any subsequent McDonald's restaurants to be developed in the Omaha/Council Bluffs area.

In 1964, the Copeland Corporation, with the consent of McDonald's Systems, Inc., sold its franchise to plaintiff, Schupack. In 1976, Schupack, contending that Copeland also assigned the right of first refusal, filed suit in the Douglas County District Court seeking a declaratory judgment determining the rights and obligations under the right of first refusal. McDonald's contended that the right was personal to Bernard Copeland and non-assignable. The Douglas County District Court held "the right given to Copeland was not a personal contract and was freely assignable without McDonald's consent." *Id.,* 264 N.W.2d at 828.

McDonald's appealed the decision, and the Supreme Court of Nebraska reversed the district court, holding that "the right was personal only to Copeland and did not pass to the plaintiffs." *Id.* at 839. The Nebraska Supreme Court citing *Rossetti v. City of New Britain,* 163 Conn. 283, 303 A.2d 714 (1972), determined that "whether a duty is personal such that it cannot be delegated is a question of the intention of the parties to be ascertained from the contract, its nature and the attending circumstances." *Id.* at 830.

The court based its decision that the right of first refusal was personal on several factors. First, it determined that McDonald's utilized a standardized selection criteria based on managerial skills. Copeland, who was a prominent executive of a large corporation, was "considered to be special" by McDonald's. *Id.* at 832.

Second, although Copeland Corporation was a 50–50 partnership owned by both Copeland and Skogg, the document conveying the right only named Copeland and expressly stated that "the right will not pass to an heir or purchasers, etc." *Id.* at 833. Furthermore, at the district court trial, Copeland's partner, Skogg, testified that it was his

understanding that the right was "individually and personally" held by Copeland. *Id.* at 833.

Third, although Schupack was permitted to buy the franchise, the right of first refusal was not listed as a corporate asset, nor was any portion of the purchase price allocated to the right. *Id.* at 838. Finally, the district court transcript contained testimony indicating that Schupack was advised, prior to the purchase of the franchise, that the right was personal and would expire at the time of the sale from Copeland. *Id.* at 837.

Although Abbott emphasizes *Schupack*, its reliance on the case is misplaced. First, Abbott takes for granted that under 11 U.S.C. § 365(c) a contract can only be assumed if it is assignable under non-bankruptcy law and that to determine assignability the Court should use the hypothetical test espoused in *In re West Electronics, Inc.*, 852 F.2d 79 (3d Cir.1988).

In *West*, the Third Circuit states that the court must determine if the contract could, under non-bankruptcy law, be assigned to any third party without consent. If not, it is not assumable. In addition, *West* found that the debtor, a party to the prepetition contract, was a different entity from the debtor-in-possession. Therefore, if the debtor could not assign to any third party, it could not assign to the debtor-in-possession, and the contract could not be assumed.

Contrary to *West*, most bankruptcy courts have expressly rejected the 3rd Circuit's hypothetical test. See, e.g., *In re Fastrax, Inc.*, 129 B.R. 274 (Bankr.M.D.Fla.1991); *In re Cardinal Industries, Inc.*, 116 B.R. 964 (Bankr.S.D.Ohio 1990); *In re Cable Partners, L.P.*, 154 B.R. 813 (M.D.Ga.1993); *In re Hartec, Inc.*, 117 B.R. 865 (Bankr.W.D.Tex. 1990), *vacated* on other grounds, 130 B.R. 929 (Bankr.W.D.Tex.1991).

Second, the debtor/Abbott scenario may be distinguished factually from *Schupack*. *Schupack* involved an assignment of a right from one party to a third party, over the objection of the grantor of the right. This case involves the assumption of an executory contract by the debtor-in-possession from the debtor. The former involves a transfer to a new entity, while the latter involves assumption by the same entity. In *In re Cable Partners L.P.*, 154 B.R. 813 (M.D.Ga.1993), the court found no reason to distinguish between the debtor and the debtor-in-possession, since the debtor-in-possession is the successor in interest and acquires all of the debtor's rights and assets, including rights under executory contracts. *Id.* at 815.

■ In the Eighth Circuit, the debtor and debtor-in-possession are the same entity for the purpose of defining rights under an executory contract. *U.S. Through ASCS v. Gerth*, 991 F.2d 1428 (8th Cir.1993).

Likewise, the court in *In re Cardinal Industries, Inc.*, 116 B.R. 964 (Bankr.S.D.Ohio 1990), concluded that "Congress did not intend 365(c) to preclude assumption of an otherwise non-assignable personal service contract, if the performance to be rendered will be the same as if no petition had filed." *Id.* at 979. The court in *In re Fastrax, Inc.*, 129 B.R. 274 (Bankr.M.D.Fla.1991), agreed, stating that the 1984 amendment to 365(c) "makes it clear that the prohibition against a trustee's power to assume an executory contract does not apply where it is the debtor-in-possession that is in possession and the performance to be given under a personal service contract will be the same as if no petition was filed." *Id.* at 277.

■ Third, assuming the hypothetical test is the proper interpretation of 365(c), the court must still be convinced that the Agreement between the debtor and Abbott was a personal service contract. This determination is very fact sensitive. "The fact that a contract calls for the performance of labor or service is not sufficient to render it nonassignable, if, from consideration of the entire contract, it appears that personality is not an essential consideration, and only a certain object or result is contracted for and not the personal labor or services of the promisor." *Fastrax*, 129 B.R. at 278.

The Agreement between the debtor and Abbott is not factually similar to the *Schupack* right of first refusal. The Agreement originally required the personal expertise of John Westering, president of OMS. However, the Third Addendum deleted the require-

ment of personal service and expertise by Mr. Westering, and provided that Abbott could contract for similar services to be provided by other entities. The Agreement, by its own terms, contains an assignment clause. Exhibit 1, Third Addendum, Paragraph 18, page 11. It is clear from another contract to which the debtor and Abbott are parties that they know how to define a personal service, non-assignable contract when they choose to do so. *See* Bank Exhibit 26, Paragraph 12.5, the Dodds Merchants Agreement. It states:

> The performance of MDFS under this Agreement involves matters acknowledged to be peculiar to MDFS in its financial condition, experience and dedication to service. MDFS shall not (a) assign its rights of (b) delegate or subcontract its duties under this Agreement without the prior written consent of Bank and OMS, which consent may be withheld in the sole discretion of Bank and OMS. Subject to the foregoing this Agreement is binding upon the respective successors and assignees of the parties.

■ Considering the language of the Agreement and the services to be provided, the Court finds that the Agreement is not a personal service contract which cannot be assigned. The Agreement is, therefore, assumable if the debtor is capable of curing the defaults, compensating for actual pecuniary loss and assuring future performance. 11 U.S.C. § 365(b)(1).

In order to determine whether the debtor's breaches could be cured or resulted in actual pecuniary losses to Abbott and whether the debtor had the ability to compensate for such actual pecuniary losses, the Court permitted the parties to present their best evidence on the damages and ability to cure.

Abbott's president testified concerning the breaches that he alleged had been caused by the debtor. He agreed that although the debtor's contract with Union was probably the most serious and material of the breaches, the relationship between Abbott and Union remains satisfactory. Union is still a major Agent bank of Abbott. There has been no termination of the Union/Abbott relationship, nor is there any evidence that that relationship has been harmed in any way.

Abbott claimed in its initial letter of October 11, 1993, that confidential information had been transferred from the debtor to Union without Abbott's permission. Although there was testimony about the type of information that was transferred from the debtor to Union and although it appears that Abbott could consider the information confidential, Abbott failed to explain on what basis it asserts that the debtor upon the suggested termination of Merchants by Abbott, had the right to attempt to move the Dodds Merchant business from Abbott to another bank, but that any financial information concerning the Merchants could not be shown to the potential assignee of the Merchant business. Abbott's outrage at the transfer of information is inconsistent with the language and intent of the Agreement which permits the transfer. Without being able to provide a potential assignee the financial information about the block of business being assigned, the assignee would have no basis upon which to decide if the assignment was a good business decision.

Although Abbott claims in this proceeding that it is the absolute owner of all of the relationship and all rights accruing from the relationship with the Dodds Merchants, the Agreement between Abbott, the debtor and the Dodds Merchants specifically provides at Paragraph 2.2 of Bank Exhibit 26: "The Merchant applications, relationships and underlying agreements shall be the sole and exclusive property of Bank and OMS." Although this Court is not making a determination of whether or not transfer of information concerning the Dodds Merchants to Union was a violation of the Agreement, it is difficult for this Court to understand how the debtor was supposed to attempt to transfer merchant business that Abbott did not want to other banks if it could not transfer financial information. It is difficult to understand how such financial information could be considered a trade secret or confidential information owned solely by Abbott when the contractual arrangement between the parties suggests otherwise. At any rate, there is no evidence of any damage being caused Abbott resulting from the transfer of the financial information.

Although there were many allegations in the opening statement and in the closing argument that the debtor, by its actions or failure to act, had created horrendous difficulties between Abbott and regulatory agencies, there is absolutely no evidence concerning the harm caused to Abbott or violations of the Agreement by the debtor which brought regulatory wrath upon Abbott.

Exhibit 10, the October 26, 1993, letter from Abbott to the debtor concerning notice of breach, contains thirteen numbered paragraphs of alleged defaults. The only evidence supporting the position of Abbott with regard to allegation No. 1 in the October 26, 1993, letter that the debtor has failed to support the operation and growth of the business is that in 1993 there was one fewer Agent bank signed up than in 1992 and there were very few new credit cards issued. Mr. Westering, president of the debtor, testified in response that Abbott had not been willing to change its program to meet the market and that no new marketing programs had been jointly developed. Even if the actions alleged by Abbott can be considered a breach of the Agreement, there is no evidence of monetary damages. The same issue is raised in Paragraph 3.

Paragraph 4 claims that the debtor has generally failed to attend to matters pertaining to customer services of Abbott's Merchants, Agents or ISOs. No evidence was presented on this issue. In Paragraph 5, Abbott claims that the debtor has not provided reasonable accounting, dial terminal support or data processing expertise as Abbott has reasonably requested. Mr. Westering denied this allegation, and there is no evidence to support the allegation. The business has been continuing with the debtor providing services to Abbott. There is no documentary evidence and no testimonial evidence that the debtor had failed to do its job. Abbott's president suggested that at a couple of different Board of Directors' meetings this issue was the subject of discussion. This testimony is the extent of the evidence in support of the allegation.

Paragraph 6 alleges that the debtor has failed and neglected to assist Abbott in development of applications, agreements, etc.; assist Abbott in reviewing Merchant, Agent and ISO activities; provide information as to third party vendor relationships with Abbott; provide information concerning card holder, Merchant, Agent, ISO applications or assist Abbott in analysis thereof; provide assistance in strategic planning; negotiate third party vendor contracts for Abbott; provide expertise at its disposal (including that of Mr. Westering) for continued effective operation and growth of Abbott's card division; attend, meaningfully, monthly meetings with Abbott and discuss relevant issues; and assist, meaningfully, in development and updating Merchant, Agent and ISO policies and procedures or assist in development of a three-year strategic plan. The president of Abbott presented absolutely no testimony on most of those allegations. He also was not aware of whether or not Abbott had ever requested the assistance of the debtor on most, if not all, of those alleged failures.

Concerning the allegation that the debtor had failed to meaningfully attend monthly meetings with Abbott and discuss relevant issues, the president only referred to minutes of the Board of Directors' meetings. He had no personal knowledge of the substance of the allegation and acknowledged that a representative of the debtor did appear at at least one or two Board of Directors' meetings during the year 1993. With regard to the allegation that the debtor failed to provide expertise at its disposal (including that of Mr. Westering), there is no evidence. However, even if there was evidence, there is nothing in the contractual arrangement between the parties, specifically the Third Addendum, that requires Mr. Westering to provide any expertise or that requires the debtor to obtain the services of Mr. Westering. The Third Addendum specifically deleted this requirement. With regard to the balance of the allegations in the October 26, 1993, letter, Exhibit 10, Abbott presented no evidence to support the allegations.

Even assuming that Abbott had presented evidence on each one of the allegations of breach, Abbott totally failed to present any evidence of actual pecuniary loss resulting from such breach.

The debtor, through its president Mr. Westering, testified that it was willing and able to cure any and all defaults. Assuming that all of the allegations of default are true, the breach allegedly caused by the debtor's contract with Union has been cured by the termination of that Agreement and by the testimony of the president of Abbott that the relationship between Abbott and Union is satisfactory. All of the other allegations have to do with services to be rendered in the future and there was no evidence of harm caused by the alleged failure to provide services pursuant to the Agreement in the past. If the transfer of financial information about the Dodds Merchants to Union was a breach of the contract, no evidence was presented concerning damages.

With regard to the obligation under 11 U.S.C. § 365(b)(1)(B) to compensate Abbott for any actual pecuniary loss, the only evidence of such pecuniary loss is related to a "reserve" account which was set up by arrangement of Abbott and Dodds. The funds in such account apparently were to be deposited to protect Abbott with regard to its potential exposure for chargebacks on credit card transactions processed through the Dodds Merchants. In the fall of 1993, the debtor purchased from the Dodds organization the Dodds' right to revenue from transactions processed through the Dodds Merchants. The revenue was the source of the reserve account. The debtor obtained permission from an officer of Abbott to take possession of approximately $26,000.00 in the reserve account.

Although Abbott presented no evidence as to how this receipt by the debtor is a breach of the Agreement, assuming that it is, the debtor has the capability of repaying to the reserve account the amount which was originally removed, approximately $26,000.00. The schedules which were filed on January 21, 1994, show that on the petition date the debtor had cash on hand of over $100,000.00, approximately $40,000.00 of which was subject to a lien. In addition, it had estimates of amounts due from Abbott for prepetition services rendered of more than $20,000.00. Finally, since the petition date, the debtor has provided post-petition services to Abbott pursuant to the temporary restraining order issued by the Douglas County District Court. Some funds should be owed to the debtor as a result of those services. In other words, if the debtor is allowed to assume the Agreement and if Abbott will comply with its obligations under the Agreement, there are sufficient funds available to compensate Abbott for its actual pecuniary loss. Even if the debtor cannot obtain funds from Abbott to immediately compensate Abbott for the loss of the $26,000.00, the debtor, according to its schedules, has over $60,000.00 available for such payment.

The final obligation of the debtor is to convince the Court that it can adequately assure future performance. The president of the debtor testified concerning the history of the relationship between the parties, the intent of the Agreement and the ability of the debtor to perform the contract in the future. No evidence was presented contrary to the position of the debtor that it could perform the contract pursuant to it terms.

The Agreement is necessary to the ongoing viability of the debtor. Assumption of the Agreement is consistent with the exercise of sound business judgment.

Based upon the above factual findings and discussion of the applicable law, the Court finds that the motion to assume the contract should be and is hereby granted.

A separate journal entry shall be filed.

*JOURNAL ENTRY*

IT IS ORDERED:

The motion to assume the Agreement, which is an executory contract, is granted.