In re CARTERHOUSE, INC., d/b/a All American Moving and Storage, Debtor.

Bankruptcy No. 5–87–00436.

United States Bankruptcy Court, D. Connecticut.

Dec. 29, 1988.

H. Talmage Day, Jr., Hebb & Gitlin, Hartford, Conn., for North American Van Lines, Inc.

Ira B. Charmoy, Charmoy & Kanasky, Bridgeport, Conn., for debtor.

## MEMORANDUM AND DECISION ON OBJECTION TO CHAPTER 11 PLAN

ALAN H. W. SHIFF, Bankruptcy Judge.

North American Van Lines, Inc. (NAVL), objects to confirmation of the debtor's Fourth Amended Plan of Reorganization on several grounds, including the claim that the debtor violated its "Agency Contract" (Agreement). Specifically, the question presented is whether the debtor has competed with NAVL in violation of the Agreement. If the answer is yes, the debtor's Plan may not be confirmed.

### I.

The debtor, a Connecticut corporation, is engaged in the moving and storage business. Alden Carter is the president and owner of 100% of the common stock of the debtor, and Sally Horvath is its controller. The debtor entered into the Agreement on December 30, 1986, to act as an agent of NAVL, a Delaware corporation.[1] Under the Agreement, the debtor provides services such as soliciting and booking contracts for the interstate shipping of household goods. NAVL provides trucks and drivers and coordinates shipping services. In addition, NAVL establishes standards to be followed by its agents.

The Agreement provides:

2.2 Agent warrants: (i) that it is and shall continue to be fit, willing and able to provide adequate household goods transportation services and to fulfill its obligations under this Agreement; (ii) that it shall represent Company faithfully and exclusively; (iii) that it shall diligently solicit, procure, register and book shipments of household goods for and on behalf of Company and for or on behalf of no other person or entity; (iv) that it shall neither compete with Company nor represent any competitor of Company within the subject matter of this agency appointment; (v) that it shall at all times refrain from, and take all actions necessary to avoid, creating an appearance that it is authorized to represent Company for any purpose not expressly set forth in and authorized by this Agreement; and (vi) that it shall not directly or indirectly induce reliance on Company's reputation, position, or stature for any purpose not expressly authorized in this Agreement.

*NAVL Exhibit 4.*

On January 22, 1985, Carter and Horvath incorporated a second moving business, Abacus, Ltd., Inc. *NAVL Exhibit 1.* Carter is the president and owner of 100% of the common stock of Abacus, and Horvath is its vice-president. On July 13, 1987, Carter, acting as president of Abacus, executed an agency agreement with Security Van Lines, Inc., similar to the Agreement the debtor has with NAVL. *NAVL Exhibit 3.*[2] Security and NAVL are competing carriers of household goods. Abacus does not "hold"[3] ICC authority to transport

---

1. The Agreement was executed by the debtor on December 30, 1986; the debtor had acted as a NAVL agent under a predecessor agreement since 1979.

2. Abacus, Ltd., Inc., is referred to as Abacus Storage & Transport in its agency agreement with Security Van Lines, Inc.

3. Carter testified that the debtor purchased all assets of Palmer Brothers Moving & Storage, which held an ICC license. Carter purchased

household goods. It conducts all of its business as a booking agent for Security, which holds an ICC license, and uses its own vehicles and drivers. Abacus is located in the same building as the debtor but does not have its own isolated location. Its facilities consist of a desk, a telephone, and a filing cabinet within an area shared by the debtor's bookkeeper. Abacus rents space from the debtor, but does not have a written rental agreement and does not pay rent regularly.

On June 11, the debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The debtor's Plan proposes to assume the Agreement and "fund the Plan from revenues generated by post-petition operations." *Debtor's Fourth Amended Plan of Reorganization art. six, at 11–12.*

## II.

Code § 1129(a) provides:

The court shall confirm a plan only if all of the following requirements are met:

. . . .

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

"Paragraph (11) requires a determination regarding feasibility of the plan." S.Rep. No. 95–989, 95th Cong., 2d Sess. 128 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5914. While success need not be guaranteed, "the feasibility standard is whether the plan offers a reasonable assur-ance of success." *Kane v. Johns–Manville Corp. (In re Johns–Manville Corp.),* 843 F.2d 636, 649 (2d Cir.1988).

Code § 365(b)(1) provides in part:

If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of the assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default. . . .

This provision extends to nonmonetary as well as monetary breaches. *See Madison-view Towers v. Yardley (In re Yardley),* 77 B.R. 643, 645 (Bankr.M.D.Tenn.1987). If a breach of the noncompetition clause is found, the debtor may not assume the Agreement because the Plan fails to provide a cure as required by § 365(b)(1)(A). As a consequence, the Plan may not be confirmed because its funding is primarily dependent upon the continuance of the debtor's contractual relationship with NAVL.[4]

### A.

### Contract Analysis

Initially, this court must determine whether Connecticut or Delaware law governs this controversy. The debtor invokes the doctrine of *renvoi* to support its claim that Delaware conflict of laws rules should apply because § 13.7 of the Agreement provides that "[t]he parties agree that this agreement shall be interpreted, construed and enforced in accordance with the laws of the State of Delaware." *NAVL Exhibit*

---

John Moore Moving & Storage, a proprietorship from which Abacus was formed. Carter claims that the debtor transferred the ICC license which had been held by Palmer Brothers to John Moore, and that although Abacus was not issued its own ICC license, it has the *right to use* the ICC license issued to Palmer Brothers. The accuracy of that claim is questionable. Moreover, Carter's testimony and the testimony of Teri L. Whittaker, NAVL's senior attorney, demonstrate that it is necessary to "hold" an ICC license to be a "carrier", and that Abacus neither held nor now holds an ICC license.

**4.** In its pretrial memorandum NAVL contends that the debtor's Plan should not be confirmed because it does not provide for a prompt cure of monetary defaults and is not feasible because NAVL may terminate the Agreement post-confirmation as a result of the debtor's alleged breach of the noncompetition clause. Recognizing that the parties agreed that the narrow issue to be tried was whether the debtor breached the noncompetition clause, the first line of inquiry should be whether the debtor's Plan is unconfirmable due to § 1129(a)(11).

*4.*[5] The debtor maintains that application of Delaware conflict rules would make Connecticut substantive law applicable. The general rule, however, is "that federal courts must apply the ... conflict of law rules of the forum state in which it sits." *Tifco, Inc. v. U.S. Repeating Arms Co. (In re U.S. Repeating Arms Co.),* 67 B.R. 990, 994 (Bankr.D.Conn.1986). *See also Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). I conclude that in this district the general rule is applicable in these circumstances, so that Connecticut conflict of laws rules govern. *See Economu v. Borg–Warner Corp.,* 652 F.Supp. 1242, 1246–48 (D.Conn.1987), *aff'd,* 829 F.2d 311 (2d Cir. 1987).[6]

■ Traditionally, Connecticut courts have applied a *lex loci* analysis "to choice of law problems holding that 'in contract actions the laws of the place of contracting governs substantive issues....'" *Economu, supra,* 652 F.Supp. at 1247 (quoting *Schirm v. Auclair,* 597 F.Supp. 202, 205 (D.Conn.1984)). However, where reliance on that approach would produce arbitrary or irrational results,

> the law of the state chosen by the parties shall govern unless the state whose law was chosen either has nothing to do with the transaction, or application of that state's law would contradict a fundamental policy of a state which has a greater interest in the action and whose law would otherwise apply had it not been for the parties' choice.

*Id.* 652 F.Supp. at 1247. Even if Connecticut has a greater interest in the Agreement, it has not been demonstrated that the application of Delaware law would contradict a fundamental policy of Connecticut. Of greater significance is the compelling argument by NAVL that adhering to the *lex loci* rule would subject its "Agency Contract" to a multitude of interpretations under a variety of state laws. Accordingly, I conclude that the contract law of Delaware, the state of NAVL's incorporation, governs the interpretation of the Agreement.

### 1. *The Agreement*

■ It is uncontested that Abacus was organized to compete with NAVL by serving as a booking agent for Security. The debtor, however, argues that NAVL waived its right to limit competition under the Agreement, and that it is industry custom to have multiple agency agreements and shared space. In support of the debtor's waived argument, Horvath testified that NAVL's local representative knew of the existence of Abacus in early December, 1986, and acquiesced to the debtor serving as an agent for Security. That argument is without merit. Apart from the contrasting testimony of that employee and the absence of any evidence that employee had authority to vary the terms of the Agreement, even assuming he said what Horvath attributed to him, the Agreement was executed by Carter in late December and clearly repudiates any right of the debtor to compete. The debtor's reliance on industry custom is equally without merit, as the Agreement defines limitations on such practices.

■ The debtor's alternative position is that it did not violate § 2.2 because that subsection only prohibits an "Agent" from competing with and representing any competitor of NAVL; the corporate debtor is the only "Agent" named in the Agreement; and the Agreement should be construed against its drafter, NAVL, and not be read as implying anything other than what it

---

**5.** *Renvoi* is the concept of looking to the whole law of a state, including its conflict of laws rules, rather than just its substantive law. *See Rutherford v. Gray Line, Inc.,* 615 F.2d 944, 947 (2d Cir.1980); *Tyminski v. United States,* 481 F.2d 257, 267–68 (3rd Cir.1973); *Carlos v. Philips Business Systems, Inc.,* 556 F.Supp. 769, 774 n. 4 (E.D.N.Y.1983), *aff'd,* 742 F.2d 1432 (2d Cir.1983).

**6.** The court in *Economu* considering a similar clause, i.e. that the "validity, interpretation, construction and performance of this Agreement shall be governed by the laws" of a particular state, concluded that those words only related to the designated state's substantive law, not all of that state's law, including its conflict of laws rules. *Economu, supra,* 652 F.Supp. at 1248.

expressly provides so as to avoid forfeiture.

"The basic rule of contract construction [under Delaware law] gives priority to the intention of the parties." *E.I. duPont de Nemours and Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del.1985). To ascertain the intent of the parties, the court must examine and construe the language of the contract as a whole, giving effect to all of its provisions. *See id.; Seabreak Homeowners Ass'n, Inc. v. Gresser*, 517 A.2d 263, 269 (Del.Ch.1986), *aff'd*, 538 A.2d 1113 (Del.1988); *Dupont v. Wilmington Trust Co.*, 29 Del.Ch. 7, 45 A.2d 510, 517 (1946); *Hudson v. D & V Mason Contractors, Inc.*, 252 A.2d 166, 169 (Del.Super.Ct.1969). Courts are to avoid a construction which runs counter to the overall scheme or plan of the contract or which would render any provision meaningless or illusory. *E.I. duPont de Nemours, supra*, 498 A.2d at 1113; *Seabreak Homeowners Ass'n, Inc., supra*, 517 A.2d at 269; *Hudson, supra*, 252 A.2d at 168. Further, where language in an agreement is susceptible to two constructions,

> "one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes it a rational and probable agreement must be preferred to that which makes it an unusual, unfair, or improbable contract."

*Holland v. Nat'l Automotive Fibres*, 22 Del.Ch. 99, 194 A. 124, 127 (1937) (quoting *A. Leschen & Sons Rope Co. v. Mayflower Gold Mining & Reduction Co.*, 173 F. 855, 857 (8th Cir.1909)).

The debtor's reliance upon the rule of construction that ambiguities be resolved against the drafter of a document is unavailing. That rule "is one of last resort, such that a court will not apply it if a problem in construction can be resolved by applying more favored rules of construction ...", *E.I. duPont deNemours, supra*, 498 A.2d at 1114, such as a determination of the parties intent. As discussed below, I have looked for and found the intent of the parties. The debtor's mention of anti-forfeiture principles is also unpersuasive. The debtor presented no evidence and made no argument which would support their application.

I find that the prohibition against the debtor acting as an agent for NAVL's competitors was also intended to bind Carter. The purpose of that prohibition is not obscure. NAVL promotes its image as a reliable, efficient carrier of household goods. It has a nationally recognized name. Consumers dealing with its agents commonly assume that they are dealing with NAVL. NAVL provides its agents with proprietary and confidential information. Although NAVL permits the owners and principals of its agents to form a separate competing corporation *holding its own ICC license*, NAVL has the right to insist that its agents, including their principals and fiduciaries, will not serve as agents for its competitors. Thus, looking at the contract in its entirety and assessing the credibility of the witnesses, I conclude that the parties could not have intended to block the corporate entity but not its principals from forming a separate corporation to act as an agent of one of its competitors. A contrary finding would reduce the contract provisions intended to protect NAVL to a nullity.

### 2. *NAVL's Agency Policy*

Assuming *arguendo* that the intent of § 2.2 lacks clarity under the foregoing analysis, its meaning is sharply focused by a written statement of NAVL's policy. NAVL's policy in relevant part provides:

> The owners or principals of a non-carrier organization which hereafter contracts as an *agent* of NAVL, may, if they elect, own or be affiliated with a separate organization which *holds an ICC certificate* to transport household goods as a motor carrier, provided the organization is separate and autonomous from the organization which is the NAVL agent....
>
> ....
>
> The policy does not preclude the owners or principals of an NAVL agency from organizing a separate corporation which

*holds ICC operating authority* to transport household goods. No competition is foreclosed by a separate carrier which is owned or controlled by the owners of the NAVL agency. However, when the public dealt with that carrier, it would know it was not dealing with NAVL.

*Debtor Exhibit D at 4, 7* (emphasis added).

NAVL's policy was in effect in 1982, approximately five years before Carter signed the Agreement. The debtor's argument that the policy was permissive, rather than restrictive, is at best unpersuasive sophistry. It is apparent from the reliance the debtor placed upon NAVL's policy during the trial, that Carter knew that while NAVL's policy permitted the owners or principals to form a separate corporation which "holds" ICC operating authority to compete with NAVL, that policy did not authorize such owners or principals to form a second corporation to compete by booking jobs with a competitor holding its own ICC license. Even if Carter believed that Abacus had the right to "use" the ICC license issued to Palmer Brothers and that there was no violation of the Agreement, the evidence demonstrates that Abacus did and does not "hold" ICC operating authority.

I find that the debtor violated § 2.2 of the Agreement as clarified by NAVL's written policy, which was in place at the time the Agreement was executed.

### B.

### Corporate Veil Analysis

■ The same result is reached from a parallel analysis. A dominant theme of the debtor's position is the assertion that Abacus is a separate corporate entity which is not a party to or restricted by the Agreement. NAVL, on the other hand, contends that Abacus' corporate veil should be pierced, so that its activities may be attributed to the debtor.

In the absence of an overriding federal interest or policy, federal courts look to the law of the state of incorporation to determine whether to pierce a corporation's veil. *See United Nat'l Records, Inc. v. MCA,*

*Inc.,* 616 F.Supp. 1429, 1431 (D.C.Ill.1985); *United Paperworkers Int'l Union v. Penntech Papers, Inc.,* 439 F.Supp. 610, 620–21 (D.Me.1977), *aff'd,* 583 F.2d 33 (1st Cir.1978). No such federal interest or policy is at stake here, and Connecticut law is applicable.

Under Connecticut law the concept of corporate veil piercing is equitable in nature. Ordinarily the veil is pierced only in exceptional circumstances. *Angelo Tomasso, Inc. v. Armor Constr. & Paving, Inc.,* 187 Conn. 544, 555–57, 447 A.2d 406 (1982). Connecticut courts will pierce the corporate veil " 'in a situation in which the corporate entity has been so controlled and dominated that justice requires liability be imposed on the real actor.' " *Id.* at 552, 447 A.2d 406 (*quoting Saphir v. Neustadt,* 177 Conn. 191, 209, 413 A.2d 843 (1979)). "[T]he key factor in any decision to disregard the separate corporate entity is the element of control or influence exercised by the [entity] ... sought to be held liable over corporate affairs." *Id.* 187 Conn. at 556, 447 A.2d 406.

In evaluating whether there is an impermissible element of control or influence, Connecticut courts, under the so-called identity rule, determine whether there is:

> "such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, [so that] an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability...."
>
> . . . .
>
> The identity rule primarily applies to prevent injustice in the situation where two corporate entities are, in reality, controlled as one enterprise because of the existence of common owners, officers, directors or shareholders and because of the lack of observance of corporate formalities between the two entities.

*Id.* at 554, 560, 447 A.2d 406 (quoting *Zaist v. Olson,* 154 Conn. 563, 576, 227 A.2d 552 (1967)). *See also DeMartino v. Monroe Little League, Inc.,* 192 Conn. 271, 275–76,

471 A.2d 638 (1984).[7]

Carter and Horvath denied that they were employed by or acted on behalf of Abacus. They testified that Abacus had only one employee, Carter's wife, who answered the telephone and booked jobs through Security. Assuming that that testimony is credible, then when Horvath answered Abacus' telephone and negotiated a telephone advertising rate adjustment on behalf of Abacus, she did so as an employee of the debtor. *See Debtor Exhibits I and J.* Further, the evidence demonstrates that Carter was the sole shareholder of both corporations, and that Carter and Horvath were officers of both corporations.

While the debtor is authorized to conduct other activities at the location where it performs its duties under the Agreement, § 4.1 required the debtor to "take all necessary actions to ensure that its affiliation with [NAVL] ... is identifiable to the public as separate, distinct, and clearly distinguishable from such activities." *NAVL Exhibit 4.* The debtor attempted to excuse its failure to physically separate itself from Abacus by offering a photograph, *Debtor Exhibit K,* which showed a sign with the name Abacus on a door and testimony that substantially all of Abacus' business was conducted by telephone and that Abacus had its own telephone number. Horvath admitted during her deposition, however, that Abacus did not have a separate space, and her testimony at trial that its desk and filing cabinet were in a part of the premises shared by the debtor's bookkeeper reinforces that fact. Apparently the debtor mistakenly believed that if most of Abacus' customers chose to telephone rather than come to its business location, the debtor would be relieved of its obligations under § 4.1.

No books or records were offered to demonstrate that the debtor and Abacus were treated as separate corporations. Abacus had no written rental agreement with the debtor. According to Carter, Abacus paid the debtor sporadically, but no cancelled checks were offered to demonstrate such payments. Evidence offered by NAVL showed that Abacus regularly cashed checks for the debtor. *NAVL Exhibits 7–13.*

I find that NAVL has satisfied the identity rule. Abacus was merely an extension of the debtor, corporate formalities were not observed between the debtor and Abacus, and the "single employee" of Abacus merely made de minimis decisions, if any. I therefore conclude that the activities of Abacus which relate to its representation of a competitor of NAVL are attributable to the debtor, and that the debtor consequently violated § 2.2 of the Agreement.

### III.

 Under either a contract or a corporate veil analysis, the debtor violated § 2.2 of the Agreement. The debtor's Plan has not provided for the cure of this breach and has therefore failed to satisfy Code § 365(b)(1)(A). As a consequence, the Agreement may not be assumed, and the Plan is not confirmable. NAVL's objection to confirmation of the debtor's Plan is sustained, and IT IS SO ORDERED.

---

**7.** Connecticut courts will also pierce a corporation's veil under the instrumentality rule, which is not applicable here because NAVL has offered no evidence of concrete loss or injury proximately caused by the debtor's control over Abacus and breach of the Agreement.