**In the Matter of GP EXPRESS AIRLINES, INC., Debtor.**

**Bankruptcy No. BK96–40042.**

United States Bankruptcy Court,
D. Nebraska.

Aug. 7, 1996.

---

T. Randall Wright and Angela K. Layden, Dixon Dixon & Jessup Ltd., L.L.P., Omaha, NE, for Debtor.

Steven Turner, Mary Leiter Swick, Baird Holm, McEachen, Pedersen, Hamann & Strasheim, Omaha, NE, Douglas Kelly, Houston, TX, for Continental Airlines, Inc.

Jeffrey Wegner, Kutak Rock, Omaha, NE, for Unsecured Creditors Committee.

## MEMORANDUM

JOHN C. MINAHAN, Jr., Bankruptcy Judge.

Before the court is a motion to assume executory contracts between the debtor in possession, GP Express Airlines, Inc. ("Debtor" or "GP Express"), and Continental Airlines, Inc. ("Continental"). Continental resists Debtor's motion. I conclude that the contracts are executory, that assumption is not barred by section 365(c)(1), and that nonmonetary defaults need not be cured as a condition to assumption.

## FACTS

Debtor and Continental are passenger airlines. Each are parties to an Amended and Restated Airline Interline Agreement dated March 31, 1994, as amended by (1) the First Amendment to Amended and Restated Airline Interline Agreement, effective May 26, 1994; (2) a July 27, 1995, Letter Agreement and Amendment to the Airline Interline Agreement; and (3) a September 19, 1995, Letter Agreement. The agreement, as amended, is referred to herein as the "Interline Agreement." Under the Interline Agreement, passengers travelling on GP Express aircraft purchase tickets on Continental ticket stock which are issued by either Continental or GP Express.

Debtor and Continental are also parties to an agreement dated October 15, 1992, and amended effective May 26, 1994, referred to as the "OnePass Agreement." Further, Debtor and Continental are parties to the International Air Transport Association's Standard Ground Handling Agreement. This agreement is referred to as "the Ground Handling Agreements." Attached to the Ground Handling Agreements, as Annexes A and B, are certain agreements relating to services, facilities, and charges at various airports, including the following: Greenville–Spartanburg, Kansas City, Norfolk[1], Greens-

---

1. GP Express is abandoning the Norfolk routes and intends to abandon the Ground Handling Agreements relating to the Norfolk route. Continental does not object.

boro, Charleston, West Palm Beach, and Tampa. The Interline Agreement, OnePass Agreement, and Ground Handling Agreements are referred to collectively as the "Contracts."

On or about July 28, 1995, Debtor executed and delivered to Continental a promissory note in the amount of $2,258,111 (the "Promissory Note"). The Debtor is the maker of the note and Continental is the payee. A letter agreement between the parties, dated July 27, 1995, explains how the parties determined the principal amount of the Promissory Note. The principal amount of the Promissory Note is comprised of several different obligations, some of which arose under the Contracts. More specifically, the third page of the Promissory Note, titled "Attachment to Promissory Note," lists $1,636,976 in expenses owed by GP Express to Continental under the Contracts. An additional $621,135 was loaned by Continental to Debtor for purposes beyond the scope of the Contracts. The original principal amount of the Promissory Note is the aggregate of the $1,636,976 debt and the $621,135 loan.

Prior to January 3, 1996, Debtor defaulted in its payments under the Promissory Note. On January 3, 1996, Continental demanded payment and declared the balance of the Promissory Note payable in full. On January 4, 1996, Continental exercised its right to offset approximately $302,515 which was due Debtor from Continental under the Interline Agreement.

On January 10, 1996 (the "Petition Date"), Debtor filed a Voluntary Petition under Chapter 11 of the United States Bankruptcy Code. On the Petition Date, a payment in the amount of $328,756 was due from Continental to Debtor. I concluded, in a previous opinion, *In re GP Express Airlines, Inc.*, 192 B.R. 954 (Bankr.D.Neb.1996), that Continental had a right to offset the $328,756 owed to the Debtor against the amounts due prepetition from Debtor to Continental and, under Bankruptcy Code § 506, that Continental's claim on the Promissory Note was to be treated as a secured claim to the extent secured by the $328,756 payable to Debtor. I then ordered (1) that Continental pay $195,000 to Debtor, (2) that the funds so paid constituted cash collateral, (3) that Continental's interest in the funds turned over was adequately protected, (4) that Debtor was permitted to use the cash collateral funds, and (5) Continental was granted an Article 9 security interest in all post-petition accounts payable to Debtor.

Debtor is in default under the Contracts. Continental and Debtor agree that Debtor owes Continental at least $344,085.79 under the Interline Agreement as of the Petition Date. Continental contends that as of July 5, 1996, Debtor owed Continental at least $1,725,400.67.

## DISCUSSION

Continental's objection to Debtor's assumption of the Contracts is based on several grounds. As a preliminary matter, Continental asserts that the Contracts do not constitute executory contracts under 11 U.S.C. § 365(a). Alternatively, if the Contracts do constitute executory contracts under 11 U.S.C. § 365, Continental raises several separate and related arguments why the Contracts still may not be assumed. First, Continental asserts that the Debtor cannot fulfill the statutory requirements of 11 U.S.C. § 365(b), in that the Debtor may not assume the Contracts unless the Debtor cures defaults and provides assurance of future performance as required under 11 U.S.C. § 365(b)(1)(A) and (b)(1)(C).

Continental alleges that the Debtor cannot meet the cure requirements of 11 U.S.C. § 365(b) for four reasons. First, Debtor is asserted to be in breach of various material, nonmonetary provisions of the Contracts and has made no provision to cure them. Indeed, Continental asserts that it is impossible for the Debtor to cure several of its nonmonetary defaults and that, therefore, the Debtor is barred from assuming the Contracts.

Second, Continental asserts that the Debtor's continuing breaches of the Contracts are inherently incurable. Here, Continental asserts that the Debtor is in breach of the Contracts' performance standards, and that the Debtor is in breach of requirements that ticket accounting and settlement functions be performed by and through the Airline Clear-

ing House (the "ACH"). Further, Continental asserts that the Interline Agreement is breached due to a Department of Defense No–Fly Order under which government employees and Department of Defense personnel are barred from using GP Express aircraft.

Third, Continental asserts that it is not in the best interests of the bankruptcy estate to permit assumption. Finally, Continental asserts that, even if the Debtor could establish that it had an ability to cure its defaults and provide assurance of future performance, the Contracts could not be assumed under 11 U.S.C. § 365(c)(1) because the Contracts may not be assumed or assigned to a third party under applicable nonbankruptcy law.

At the pretrial conference this trial was limited to the resolution of the following issues:

1. What constitutes the Contracts between the parties?
2. Are the Contracts an executory contract under § 365 of the Bankruptcy Code?
3. Does the best business judgment test bar assumption?
4. Is assumption barred under Bankruptcy Code § 365(c)(1)?
5. Must Debtor cure nonmonetary defaults as a condition of assumption of the Contracts?

If it is determined that the Contracts are an assumable executory contract, it will be necessary to have a second trial to resolve other issues related to assumption of the Contracts under 11 U.S.C. § 365. These issues include, but are not limited to: (1) whether the Debtor has an ability to cure the monetary defaults, (2) whether the Debtor may cure monetary defaults over an extended period of time, (3) whether the Debtor has provided adequate assurance of future performance, and (4) a determination of the amount to be paid by the Debtor to cure existing defaults.

The uncontroverted facts set forth in the Preliminary Pretrial Statement are considered as established for purposes of this trial. In reaching my conclusions, I have considered the testimony of witnesses and the doc-

umentary evidence and affidavits of record. I note for the record that, in reviewing various exhibits which were received in evidence after overruling an objection to hearsay, I have not considered such exhibits as establishing the facts asserted therein, but rather have received these exhibits for other purposes. For example, Exhibit 135, a newspaper article from the Rocky Mountain News, was received in evidence for the limited purpose of establishing that there had been certain negative publicity. Exhibit 136 is a document which Mr. Barber received at a meeting which took place in Houston. Exhibit 136 was not received for the purpose of establishing that the matters set forth in the memoranda were true or that the Debtor had admitted the facts stated therein.

## 1. The Contracts

The Contracts Debtor seeks to assume include the Interline Agreement, One–Pass Agreement and Ground Handling Agreements, exclusive of the Ground Handling Agreement respecting Norfolk. A dispute exists as to whether a certain letter agreement and the Promissory Note constitute a part of the Contracts.

The first issue is whether a letter agreement dated December 20, 1994, constitutes a part of the Interline Agreement. This letter modifies the Interline Agreement and is signed by George Poullos, Chairman of Debtor, GP Express Airlines, Inc., and Jim Swigart, an employee of Continental Express Airlines. The Interline Agreement is between Continental Airlines, Inc. and GP Express, and Continental Express Airlines is not a party to the Interline Agreement. Since Continental Airlines did not sign the letter, Continental Airlines is not bound by it unless Continental is bound by the signature of Jim Swigart in his capacity as an employee of Continental Express Airlines. Based on the testimony of Mr. Poullos, I conclude that, in December of 1994, GP Express was not dealing directly with Continental. Instead, dealings with Continental were through an intermediary, namely Continental Express Airlines. Continental Express Airlines had the apparent authority to act on behalf of Continental Airlines, and I conclude that Jim

Swigart's signature on behalf of Continental Express Airlines bound Continental Airlines. Mr. Swigart was acting in his capacity as an employee of Continental Express Airlines, and Continental Express Airlines was the agent of Continental in Continental's dealings with GP Express. Therefore, the executory contract proposed to be assumed by the Debtor includes the December 20, 1994, letter agreement amending the Interline Agreement.

The second issue is whether the Promissory Note constitutes a part of the Interline Agreement. Debtor proposes to assume the Interline Agreement, OnePass Agreement, and Ground Handling Agreements, but does not want to assume the Promissory Note. Except for the Promissory Note, the parties do not contest the severability of other collateral agreements and amendments to the Interline Agreement, such as the OnePass Agreement and the Ground Handling Agreements. The issue is whether the Promissory Note, which, in part, evidences amounts owing under the Interline Agreement, constitutes a separate and distinct contract. If so, the Debtor may assume the Interline Agreement without being required to assume its obligations as maker of the Promissory Note.

■ A debtor must assume an executory contract *cum onere*, that is, subject to existing burdens. In other words, a debtor may not assume favorable aspects of an executory contract and reject its burdens. *See United States v. Carolina Parachute Corp.*, 907 F.2d 1469, 1472 (4th Cir.1990). A debtor must either assume a contract in full or reject it. Therefore, the Debtor must assume its obligations under the Promissory Note to the extent that the note constitutes a part of the Contracts.

■ The Debtor asserts that the Promissory Note does not constitute a part of the Contracts. Continental asserts the contrary. Continental's position is that the Promissory Note is, at least in part, properly considered as a part of the Interline Agreement. While federal law, rather than state law, is applied to determine whether an agreement is an executory contract, *see Cameron v. Pfaff Plumbing & Heating, Inc.*, 966 F.2d 414, 416 (8th Cir.1992), state law controls construction of the contract. *In re Qintex Entertainment, Inc.*, 950 F.2d 1492, 1496–97 (9th Cir. 1991). In this case, the court must look to Texas law to determine whether the obligations related to the Interline Agreement are severable. *See In re Pollock,* 139 B.R. 938, 940 (Bankr. 9th Cir.1992) ("Whether multiple obligations in an agreement or transaction are severable is a question of state law").

■ Under Texas law, the court is to consider whether the nature and purpose of the contract is susceptible to division and apportionment, the number and types of obligations contemplated by the contract, and the interdependency of the obligations. *In re Ferguson,* 183 B.R. 122, 124 (Bankr. N.D.Tex.1995). Under Texas law:

> A contract is divisible when the performance by one party consists of several distinct and separate items and the price paid by the other party is apportioned to each item.... Determination of the issue depends primarily on the intention of the parties, the subject matter of the agreement, and the conduct of the parties. Most courts find the intent of the parties as shown by the contract terms to be the most determinative factor in deciding whether the contract is divisible.
>
> If there is a single assent to a whole transaction involving several things, a contract is entire. If there is a separate assent to each of several things involved, it is divisible. Where the subject matter of the contract is divisible and the consideration is apportioned, these qualities are consistent with and indicative of a severable contract. However, they are not conclusive on that point.

*Ferguson,* 183 B.R. at 124–25 (citations omitted). Other courts articulate three main factors which determine whether obligations within an agreement are severable:

> (1) Whether the nature and purpose of the obligations are different; (2) whether the consideration for the obligations is separate and distinct; and (3) whether obligations of the parties are interrelated.

*In re Pollock,* 139 B.R. 938, 940–41 (Bankr. 9th Cir.1992) (applying California law), *citing*

*In re Gardinier,* 831 F.2d 974, 976 (11th Cir.1987) (applying Florida law).

The intent and conduct of the parties in executing the Promissory Note was twofold. As evidenced by page 3 of the Promissory Note, titled "Attachment to Promissory Note," and by the letter to George Poullos from Continental dated July 27, 1995, the $2,258,111 principal amount of the Promissory Note represents the aggregate of two components. The first component represents $1,636,976 in expenses owed by GP Express to Continental under the Contracts as itemized in the Attachment to the Promissory Note. The parties intended that the Promissory Note consolidate and provide for payment of the $1,636,976 owed to Continental under the Contracts.

■ The Promissory Note states that the first component arises from "(i) services ... pursuant to certain agreements between the Creditor and Maker which has (sic) given rise to certain trade payables of the Maker to the Creditor, (ii) other indebtedness owed by the Maker to the Creditor, as set forth in Attachment A hereto." The nature and purpose of the consolidated trade payables obligations and the Contracts from which these obligations arose, are interrelated. The terms of the Contracts are inherently incorporated into the Note to the extent the obligations arose out of, and the amount of the trade payables owing are calculated based on the terms of the Contracts. The July 27, 1995, letter states that: "In the event that a subsequent audit by GP confirms [that] any of the goods or services to which the Trade Debt relates were not actually delivered to GP, [Continental] agrees to reduce the amount of the Note by the amount of the

Trade Debt that is attributable to goods or services that were not delivered." Thus, the Promissory Note and the Contracts are interrelated in that the note contemplates that the amounts owed under the note will be adjusted to reflect the amounts determined to be actually owed under the Contracts. The Promissory Note incorporates the terms of the Contracts to the extent the amount of the note is determined from them.

I conclude that the Debtor is obligated to assume the $1,636,976 in Trade Debt that arose under the Contracts and is directly related to the Contracts. The fact that the Trade Debt was consolidated and evidenced by the Promissory Note does not change the underlying fact that the $1,636,976 provided by Continental for the Promissory Note was consideration provided pursuant to the Contracts. There is no evidence that the parties intended a novation. Therefore, I conclude that the trade debt payables component of the Promissory Note constitutes an obligation interrelated to the Contracts. This consolidated obligation to pay $1,636,976 is not severable from the underlying Contracts. Therefore, the Debtor must assume this obligation in order to assume the underlying Contracts.

■ The second component of the Promissory Note represents a loan of $621,135 from Continental to the Debtor. The parties designate the second component as a "New Loan."[2] The purpose for the New Loan is distinctly stated in the July 27, 1995, letter as providing Debtor with funds for its operations and to make a payment due Raytheon Aircraft Company. Thus, the purpose for the New Loan was not to meet obligations arising and owing under the Contracts. The

---

**2.** The July 27, 1995, letter states in relevant part:
2. [Continental] has agreed to extend additional credit to GP on July 28, 1995 in the amount of $621,135 (the "New Loan"), which amount will be funded pursuant to a wire transfer or other provision of same-day funds to GP's account at The Chase Manhattan Bank....
3. $494,000 of the New Loan is delivered in trust to GP in order for GP to make a payment on July 28, 1995 of such amount to Raytheon Aircraft Company ("Raytheon"), and GP agrees to make such payment to Raytheon on said date.

4. To evidence the New Loan and to set forth repayment terms thereof and to consolidate the indebtedness of the New Loan with existing trade payables indebtedness ("Trade Debt") and other indebtedness owed by GP to [Continental], GP has executed a Promissory Note in the amount of $2,258,111 and dated July 28, 1995 (the "Note"). [Continental] agrees to accept payment under the Note as satisfaction of each of the amounts specified in the Attachment to the Note.

nature and purpose of the obligation—a New Loan to assist the Debtor in financing its operations—is divisible from the nature and purpose of the original Contracts. The consideration for the New Loan, a promise to repay with interest, was separate and distinct from the obligations Debtor owed Continental which arose out of the Contracts. I conclude the New Loan represents a new and separate obligation between the parties, for a purpose different than the obligations of the parties under the Contracts. The obligation to repay the New Loan is a financial arrangement between the parties separate and severable from the Contracts. Therefore, to the extent that Debtor's obligations to Continental under the Promissory Note arise from the "New Loan," the obligations are not part of the Interline Agreement, and need not be assumed as a condition of assumption of the Contracts.

The fact that the Debtor's obligations to repay amounts due under the Contracts and the amount due under the New Loan are evidenced by a single Promissory Note does not preclude the court from concluding that only a portion of the amount due under the note constitutes a part of the executory contract to be assumed. As between the parties to the note, the payee and maker, there was no novation, and evidence of the source of the underlying obligation is properly considered. Further, I conclude that Continental could elect and sue on the note or underlying obligation whether or not the note constitutes a negotiable instrument under Article 3 of the Uniform Commercial Code, as contested by Debtor.

Continental argues that the Promissory Note is part of the underlying Contracts since under the Texas UCC[3], Continental has an election of remedies to sue under the Promissory Note or the underlying instruments. Debtor asserts that the Promissory Note is not part of the underlying Contracts, because the Promissory Note is not a negotiable instrument. Therefore, Debtor asserts, Article 3 of the Texas UCC would not apply, and Continental could only sue under the note itself, and therefore, the obligation is severable from the Contracts. Debtor relies on the language quoted above from the July 25, 1995, letter which provides that the amount actually owing on the note would be adjusted later to reflect the outcome of audits of the obligations owing between the parties. Debtor asserts that this language makes the terms of the note, specifically, the principal amount, contingent on the terms of the Contracts. Because the terms of the note are contingent and depend on agreements outside those found on the face of the note, the debtor argues, the Promissory Note is not a negotiable instrument.[4] I conclude that I need not rule on this issue. Whether or not the Promissory Note is in fact a negotiable instrument will not change the outcome of my decision. If the note is a negotiable instrument, Continental may sue on the underlying Contracts or the note itself. *See* Texas UCC § 3.310. If the note is not a negotiable instrument, I conclude the consolidation of the amounts owing under the Contracts into a single liquidated amount represented by the note, does not sever the obligation from the underlying Contracts.

---

**3.** § 3.310. Effect of Instrument on Obligation for Which Taken:

 (b) Unless otherwise agreed and except as provided in Subsection (a), if a note or an uncertified check is taken for an obligation, the obligation is suspended to the same extent the obligation would be discharged if an amount of money equal to the amount of the instrument were taken, and the following rules apply:

 ....

 (2) In the case of a note, suspension of the obligation continues until dishonor of the note or until it is paid. Payment of the note results in discharge of the obligation to the extent of the payment.

 (3) Except as provided in Subdivision (4), if the check or note is dishonored and the obligee

of the obligation for which the instrument was taken is the person entitled to enforce the instrument, the obligee may enforce either the instrument or the obligation. In the case of an instrument of a third person that is negotiated to the obligee by the obligor, discharge of the obligor on the instrument also discharges the obligation.

Texas Bus. & Com.Code Ann. § 3.310(b) (West Supp. 1996).

**4.** In this argument Debtor concedes the interdependency of the terms of the Contracts and the Promissory Note, one of the main factors relative to my finding that the Contracts and the Promissory Note were not severable obligations.

Because it is clear that the execution and acceptance of the Promissory Note did not constitute a novation setting aside and changing the basic character of the underlying obligations, it is appropriate to conclude that $1,636,976 of the principal amount of the note arose from obligations under the Contracts. That amount of money is owed to Continental in connection with the Contracts and, in order to assume the Interline, Ground Handling and OnePass Agreements, the Debtor must assume the unpaid balance of the $1,636,976 obligation owed under the Promissory Note. The remaining balance of the $621,135, the second component of the Promissory Note, does not constitute a part of the Contracts.

The Debtor asserts that the Promissory Note constitutes a financial accommodation which cannot be assumed. I conclude Section 365 requires the Debtor to assume and pay that portion of the principal balance of the Promissory Note that relates to obligations arising under the Contracts.

## 2. Do the Contracts Constitute an Executory Contract?

■ I conclude that the Contracts constitute an executory contract under section 365 of the Bankruptcy Code. In reaching this conclusion, I have applied Professor Countryman's definition of executory contract: the obligations of the parties under the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other. *See* Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 MINN.L.REV. 439, 460 (1973).

■ Among its obligations under the Contracts, Continental has the continuing unperformed obligation to sell tickets for flights on aircraft owned or operated by GP Express. Continental also has a continuing obligation to pay GP Express on its future performances. GP Express, on the other hand, is obligated to provide flight services to passengers to whom Continental sells tickets. The contractual arrangement under the Interline Agreement is an executory contract, contemplating ongoing and substantial performances by both parties. If either side fails to perform its essential obligations, performance by the other party would be excused. Therefore, the Contracts constitute executory contracts under the Bankruptcy Code.

## 3. Does Best Business Judgment Test Bar Assumption?

■ Continental next asserts that the best business judgment test bars Debtor's assumption of the Contracts. In deciding whether to approve a debtor's assumption of an executory contract, bankruptcy courts usually apply the best business judgment test. The best business judgment test generally requires a showing that assumption of an executory contract benefits and is in the best interests of the bankruptcy estate, and is the result of the exercise of reasonable business judgment. *See In re Beare Co.*, 177 B.R. 879, 882 (Bankr.W.D.Tenn.1994). Absent a showing of bad faith or abuse of debtor's discretion, however, debtor's exercise of business judgment in deciding whether to assume a lease will generally not be disturbed. *See In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr.S.D.N.Y.1994), *aff'd sub nom. John Forsyth Co. v. G Licensing, Ltd.*, 187 B.R. 111 (S.D.N.Y.1995).

■ Continental suggests the best business judgment test is not met in this case because (1) the terms of the Interline Agreement enable Continental to terminate the agreement without cause; (2) debtor's prior defaults evidence the difficulty Debtor will have performing without default under the Contracts; and (3) the terms of the Interline Agreement enable Continental to immediately terminate for cause. I conclude that Continental's argument that assumption of the Contracts is not in the best interest of the bankruptcy estate, is somewhat of a red herring. The unsecured creditors committee supports the Debtor's assumption of the Contracts. I conclude, as a finding of fact, that Debtor will not be able to reorganize unless the Contracts are assumed. The Debtor's judgment concerning the assumption should be given force and effect.

In connection with Continental's assertions, the court notes that Continental is in a

somewhat precarious position with respect to assumption of the Interline Agreement. Under an agreement between Continental and Debtor's primary secured lender, Raytheon Aircraft Acceptance Corporation, if Continental terminates its Contracts with GP Express at any time before the year 2000, Continental may incur a liability to Raytheon Aircraft of approximately $500,000 per plane on Debtor's ten 1900 UC aircraft, and $100,000 per plane on five UB series airliners. Continental may, therefore, incur a significant liability if Continental exercises its rights to cancel its executory contract with GP Express. If, on the other hand, Continental were to convince the court that Debtor's assumption of the Contracts should be denied, and GP Express therefore goes out of business, Continental will be in a much stronger position to argue that it is not obliged to Raytheon. Continental thus has some bias which could prompt it to oppose Debtor's assumption of the Contracts. The parties with a more neutral interest in the Contracts are the unsecured creditors and they do not dispute the Debtor's business judgment. I conclude that the Debtor should be permitted to assume the Contracts and that Continental's assertion, that under the better business judgment rule the Debtor should not be permitted to assume, is overruled.

### 4. Is Assumption Barred by 11 U.S.C. § 365(c)(1)?

Continental asserts that under section 365(c)(1), the debtor in possession, GP Express, is barred from assuming the contracts. In relevant part, section 365(c) provides:

> (c) The trustee may not assume or assign any executory contract ... of the debtor, whether or not such contract ... prohibits or restricts assignment of rights or delegations of duties, if—
>
> (1)(A) applicable law excuses a party, other than the debtor, to such contract ... from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract ... prohibits or restricts assign-
>
> ment of rights or delegation of duties; and
>
> (B) such party does not consent to such assumption or assignment; or
>
> (2) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor....

11 U.S.C. § 365(c).

In a straightforward, literal interpretation of this statute, Continental asserts that the Contracts may not be assumed because, under Texas law, Continental would be excused from performing for or accepting performance from any party "other" than GP Express or GP Express as debtor in possession. This literal interpretation is supported by decisional law, see, e.g., *In re West Electronics Inc.*, 852 F.2d 79, 83 (3d Cir.1988) (holding that a government military contract may not be assigned to a third party, and therefore may not be assumed by debtor in possession); *In re Pioneer Ford Sales, Inc.*, 729 F.2d 27, 29 (1st Cir.1984); *In re Magness*, 972 F.2d 689, 694 (6th Cir.1992) (holding trustee may not assign executory contract, but specifically declining to rule on whether debtor could assume the contract personally); *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir.1983). But decisional law is widely divided on the interpretation of Bankruptcy Code § 365(c)(1) and (f)(1), see, e.g., *In re James Cable Partners*, 27 F.3d 534 (11th Cir.1994); *In re Optimum Merchants Servs.*, 163 B.R. 546, 554 (Bankr.D.Neb.1994), *vacated on appeal by Consent Order*, 199 B.R. 409 (D.Neb. 1995) and cases cited therein ("Contrary to *West*, most courts have expressly rejected the 3rd Circuit's hypothetical test."); Norton Bankruptcy Law & Practice 2d § 39:20 (Supp.1996); 1 Epstein et al., Bankruptcy § 5–15 (1992).

In reviewing the above cases which prevent assumption, it is important to note the facts of the cases—they virtually all involve a situation where the debtor proposes to assume a contract *and assign* it to a third party. In the case before me, the debtor in possession proposes to assume the contract and perform its obligations under the contract. No assignment is contemplated in this case. On these facts, there is no need

to pose or answer the hypothetical question of whether GP Express may assume and assign the Contracts. Rather, the actual question, framed by the statute in this factual context, is whether Continental would be excused from performing for or accepting performance from GP Express as debtor in possession. It is clear that Continental is not excused. In this context there is no meaningful distinction between GP Express and GP Express debtor in possession. *See NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 528, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984)[5]; *United States v. Gerth,* 991 F.2d 1428, 1435–36 (8th Cir.1993) (questioning "whether the distinct entity theory remains viable in any context").

■ On facts like those before this court, where a debtor in possession simply wants to retain its prepetition executory contracts and to perform thereunder, the better reasoned result is to permit assumption, regardless of whether the contract can be assumed and assigned to a third party under applicable law. *See In re Ontario Loco. & Indust. Ry. Supplies, Inc.,* 126 B.R. 146, 148 (Bankr. W.D.N.Y.1991) (concluding that Congress did not intend to bar assumption of any contract as long as it will be performed by the debtor or debtor in possession); *In re James Cable Partners, L.P.,* 27 F.3d 534 (11th Cir.1994); *In re Hartec, Inc.,* 117 B.R. 865 (Bankr. W.D.Tex.1990), *vacated on appeal by Consent Order,* 130 B.R. 929 (Bankr.W.D.Tex. 1991); *In re Daugherty Constr., Inc.,* 188 B.R. 607, 613–14 (Bankr.D.Neb.1995) (holding the nondebtor party is not excused from accepting performance from or rendering performance to the debtor in possession); *In re Optimum Merchants Servs.,* 163 B.R. at 554 (questioning the hypothetical test interpretation and permitting assumption of contract). Commentators also advocate permitting such assumption. *See* 2 WILLIAM L. NORTON, JR., NORTON BANKRUPTCY LAW & PRACTICE 2D § 39:20 (1994 & Supp.1996) (the

better view permits the debtor in possession to assume a contract not transferable under nonbankruptcy law); 1 DAVID G. EPSTEIN ET AL., BANKRUPTCY § 5–15 (1992) (courts should read section 365(c)(1) to permit a debtor to assume a contract notwithstanding an "applicable law" prohibition on the assignment of the contract).

To bar GP Express from assuming its executory contract with Continental would be inconsistent with other provisions of the Bankruptcy Code, and impair a successful reorganization. Under section 541, property of the bankruptcy estate includes the Debtor's contractual rights under the Contract. Under section 363, it is clear that property of the estate may be used by the debtor in possession; and, under section 365, as noted by the Supreme Court, by providing for assumption or rejection by the debtor in possession, Congress contemplates that the debtor in possession is not entirely distinct from the debtor. *Bildisco,* 465 U.S. at 528, 104 S.Ct. at 1197. If the rigid interpretation of *West Electronics* prevails, bankruptcy reorganizations will be defeated when debtors in possession cannot succeed to their pre-bankruptcy contracts. In terms of the classic example of non-assignable contracts, a bankrupt artist should be permitted to complete the portrait.

Finally, sections 363(*l*), 365(e), and 541(c), indicate that the Bankruptcy Code will not enforce provisions in private agreements or under nonbankruptcy law which terminate a debtor's interest in property or an executory contract merely because of a bankruptcy filing. 11 U.S.C. §§ 363(*l*); 365(e); 541(c); *see also Daugherty,* 188 B.R. at 611–12 (declining to enforce anti-ipso facto clause in an executory contract because contrary to the provisions of Bankruptcy Code). Under Continental's interpretation, section 365(c)(1) provides for the termination of a debtor's property interest in a contract merely because of the filing of a bankruptcy petition.

---

5. The *Bildisco* Court states:

Obviously if the [debtor-in-possession] were a wholly "new entity," it would be unnecessary for the Bankruptcy Code to allow it to reject executory contracts, since it would not be bound by such contracts in the first place. For our purposes, it is sensible to view the debtor-in-possession as the same "entity" which existed before the filing of the bankruptcy petition, but empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have done absent the bankruptcy filing.

*Bildisco,* 465 U.S. at 528, 104 S.Ct. at 1197.

This result is directly at odds with the anti-ipso facto provisions of the Code. My conclusion that section 365(c)(1) does not bar assumption of contracts by the debtor in possession is consistent with other provisions of the Bankruptcy Code which decline to enforce forfeiture provisions in private contracts.

### 5. Does the Impossibility of Curing Non-monetary Defaults Bar Assumption?

A debtor may not assume an executory contract unless the debtor "promptly" cures defaults under the contract. § 365(b)(1). Until the recent amendment to section 365(b)(2)(D), it was clear that the duty to cure defaults applied to nonmonetary defaults. *See In re Carterhouse, Inc.*, 94 B.R. 271, 273 (Bankr.D.Conn.1988). If the debtor could not cure a default, including a nonmonetary default, the executory contract could not be assumed.

 On the facts of the case before me it is clear that GP Express is in default of several nonmonetary obligations under the Contracts and that cure is impossible. For example, GP Express has failed to meet performance standards relating to the completion of flights, the timely arrival of flights, and the utilization of Airline Clearing House accounting services. These breaches are historical and, by definition, cannot be cured. GP Express persuasively argues that under recently amended section 365(b)(2)(D), it is not required to cure nonmonetary defaults as a condition to assumption of the Contracts.

In relevant part, section 365(b)(2) provides that the cure, compensate, and adequate assurance conditions of assumption under section 365(b)(1) do not apply to a default that is a breach of a provision relating to—

(D) the satisfaction of any penalty rate or provision relating to a default arising from any failure by the debtor to perform non-monetary obligations under the executory contract. . . .

11 U.S.C. § 365(b)(2)(D). Continental and GP Express find this language unambiguous, but they are at opposite poles on its meaning. GP Express asserts that under section 365(b)(2)(D) it is not required to cure non-monetary defaults. Continental, reads subsection (D) as stating that, in curing defaults respecting nonmonetary obligations, the Debtor does not have to cure *any penalties* arising from the nonmonetary default.

Commentators also disagree as to the interpretation of amended section 365(b)(2)(D). *Compare* 2 LAWRENCE P. KING, COLLIER ON BANKRUPTCY ¶ 365.04[2] at 365–51 (15th ed.1996) (new subsection (D) makes it clear that it is not necessary to satisfy any provision relating to a default of a nonmonetary obligation); *with* Steven M. Goldman & Patricia A. Redmond, *Does Reform Act Eliminate the Requirement that a Debtor Cure Nonmonetary Defaults When Assuming Executory Contracts?* BANKR.CT.DEC. WKLY NEWS & COMMENT, Oct. 24, 1995, at A3, All (the adjective "penalty" should be read as modifying both "rate" and "provision"). However, even a commentary advocating Continental's interpretation acknowledges that—

At first blush the addition of Subsection (D) may arguably eliminate the requirement of cure for nonmonetary defaults. This interpretation, however, assumes that "penalty" in "any penalty rate or provisions relating to . . . nonmonetary obligations" is used as an adjective that modifies solely the noun "rate" and not both the nouns "rate" and "provision." The same result is reached if "penalty" is used as a compound noun with "rate," *see generally, Harbrace College Handbook* 13 (12th ed. 1994), such as in "penalty box" or "penalty shot," *Webster's Ninth New Collegiate Dictionary* 869 (1991). Nothing in the grammar or punctuation of Subsection (D) would support the choice of any of these possibilities over the other.

Goldman & Redmond, *supra*, at A3.

The sole reported decision directly construing amended section 365(b)(2)(D) concludes that a debtor in possession is not required to cure nonmonetary defaults, see *In re Claremont Acquisition Corp.*, 186 B.R. 977 (C.D.Cal.1995). My reading of amended section 365(b)(2)(D) is consistent with *Claremont*. I read this subsection as addressing two separate issues. It states that a debtor is not required to cure or satisfy any penalty

rate obligation and the debtor is not required to cure any defaults in nonmonetary obligations. The statutory term "rate" refers to interest rate, in my view. By definition, there is no interest accrual on a nonmonetary obligation. This suggests that subsection (D)'s reference to "penalty rate" has reference to the interest rate payable on a monetary obligation and that the second proviso of (D) has a separate and distinct reference to nonmonetary obligations. Continental's reading of the amended subsection (D) results in illogical requirements: A "penalty rate" would be enforceable and would have to be cured on a monetary obligation but not on a nonmonetary obligation. If penalties are not favored, they should not be required to be cured in either case. Further, under Continental's interpretation, debtors would have to cure nonmonetary defaults, which is often impossible, but would be relieved of the obligation to cure "penalty rates," which appears to provide illusory relief.

Continental asserts that by not requiring cure of nonmonetary defaults, the court, in effect, modifies the Contracts and requires future performance by Continental in the face of continuing nonmonetary defaults by Debtor. This argument confuses preassumption and post-assumption obligations. The fact that Debtor does not have to cure preassumption nonmonetary defaults does not mean that Debtor is excused from performing its nonmonetary obligations after assumption. In order to assume the contracts, Debtor must provide adequate assurance that it can perform its nonmonetary obligations in the future. If such assurance is not provided, the contracts cannot be assumed under section 365(b)(1)(C).

I conclude that Debtor is not required to cure preassumption nonmonetary defaults under the Contracts in order to assume the Contracts.

### CONCLUSION

The executory contracts proposed to be assumed by Debtor are comprised of (1) the Interline Agreement, as amended on May 26, 1994, July 27, 1995, September 19, 1995, and as amended by the letter agreement dated December 20, 1994, signed by George Poul- los, Chairman of GP Express and Jim Swigart, on behalf of Continental Express Airlines; (2) the OnePass Agreement; and (3) the Ground Handling Agreements, with the exception of the Ground Handling Agreement relating to the Norfolk terminal. These agreements constitute executory contracts under Bankruptcy Code § 365. Bankruptcy Code § 365(c) and the best business judgment rule do not prevent Debtor from assuming the executory contracts. Further, Debtor is not required to cure nonmonetary defaults as a condition to assumption of the executory contracts.

A separate trial will be scheduled to resolve the remaining issues relating to Debtor's assumption of the executory contracts, which include, but are not limited to; (a) the liquidated amount of any monetary obligations and defaults under the executory contracts; (b) whether the Debtor has an ability to cure the monetary defaults; (c) whether the Debtor may cure the monetary obligations due under the Contracts over an extended period of time; and (d) whether the Debtor can give adequate assurance of future performance under the executory contracts.